Angus BROWN et al.,
Plaintiffs-Appellees,

v.

Carl NEEB et al., Defendants-Appellants,

Fire Fighters Local Union 92, affiliated
with the International Association of
Fire Fighters, Intervenor-Appellant.

Nos. 80–3468, 80–3476.

United States Court of Appeals,
Sixth Circuit.

Argued Sept. 18, 1980.

Decided March 3, 1981.

552

Robert G. Young, Regional Justice Center, Frank T. Pizza, Toledo, Ohio, for defendants-appellants in 80–3468.

Glenn G. Galbreath, Joseph R. Tafelski, Toledo, Ohio, for plaintiffs-appellees in 80–3468.

Ted Iorio, Tobie Braverman, Gallon, Kalniz & Iorio, Co., L.P.A., Toledo, Ohio, for intervenor-appellant in 80–3476.

Dale A. Wilker, Thomas A. Karol, Toledo, Ohio, for plaintiffs in 80–3476 and for plaintiffs-appellees in 80–3468.

John J. Burkhart, City Law Dept., Toledo, Ohio, for defendants in 80–3476 and for defendants-appellants in 80–3468.

Before KEITH and BROWN, Circuit Judges, and WISEMAN, District Judge.*

KEITH, Circuit Judge.

This case presents questions regarding the scope. and effect of a consent decree. In 1972, black and Hispanic firefighter applicants sued the city of Toledo, Ohio. In 1974, the plaintiffs and defendants entered into a consent decree which, *inter alia*, committed the defendants to achieve in five years a ratio of minority employment within the fire department which reasonably reflected the ratio of each minority group to the total population of Toledo. The consent decree was silent about the effects of layoffs on the affirmative action goal. In June of 1980 economic problems forced the city of Toledo to lay off firefighters. Many of the firefighters who were laid off were recently-hired blacks and Hispanics. The plaintiffs filed motions in the district court seeking an order preventing the city from laying off the minority firefighters. The district court granted the requested relief, and this appeal was brought. We affirm.

## FACTS

In August of 1972 a class of black and Hispanic plaintiffs filed suit against the city of Toledo, Ohio. The plaintiffs alleged that the city fire department's employment policies and practices violated the plaintiffs'

civil rights under 42 U.S.C. §§ 1981[1] and 1983[2] and the United States Constitution.

At the same time this suit was filed, a related suit was brought against the Toledo police department, also alleging discriminatory employment practices. *Sarabia v. Duck*, 601 F.2d 914. In addition, in August of 1973 a group of black and Hispanic police officers brought suit against the Toledo police department. This suit alleged that the city engaged in illegal discrimination in the promotion of police officers within the department. All three cases were assigned to District Judge Don Young.

The police department promotions case went to trial first. Judge Young found discrimination and ordered appropriate relief. *Afro-American Patrolman's League v. Duck*, 366 F.Supp. 1095 (N.D.Ohio, 1973). This court affirmed. *Afro-American Patrolman's League v. Duck*, 503 F.2d 294 (6th Cir. 1974).

After this court's affirmance of Judge Young's findings of discriminatory employment[3] and promotional practices in the Toledo police department, *Afro-American.Patrolman's League, supra,* the city of Toledo moved to resolve the pending cases of *Sarabia v. Duck*, alleging discriminatory employment practices in the Toledo police department, and this case, alleging discriminatory employment practices in the Toledo fire department. The city and the plaintiffs in

---

* The Honorable Thomas A. Wiseman, United States District Court Judge for the Middle District of Tennessee, sitting by designation.

1. § 1981 provides:
   All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

2. § 1983 provides:
   Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privi-

leges, or immunities secured by the Constitution and Laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

3. The issue presented for review in *Afro-American Patrolman's League v. Duck* was whether the city of Toledo had unlawfully discriminated against minorities in police promotions. However, because promotions were made from within the police department, promotions would necessarily reflect past discrimination in police hiring. For this reason, this court examined police hiring and affirmed Judge Young's conclusion that illegal discrimination had taken place in police hiring, which was perpetuated by the promotional system used by the department. *See also Harless v. Duck*, 619 F.2d 611 (6th Cir.), *cert. denied,* —— U.S. ——, 101 S.Ct. 212, 66 L.Ed.2d 92 (1980) (sex discrimination in Toledo police department).

*Sarabia* and in this case agreed upon a consent settlement.

On November 27, 1974, a consent decree was signed by the parties and approved by Judge Young. The consent decree entered in *Sarabia* was nearly identical to the consent decree entered in this case.

The consent decree read as follows:

WHEREAS, petitioners commenced this action in an effort to redress alleged discrimination against blacks, Hispanics, and other minority citizens in employment within the fire department, and

WHEREAS, the City of Toledo is strongly committed to the concept of affirmative action to erase any vestiges of past employment discrimination within its municipal government, and

WHEREAS, both parties to this action agree that only qualified candidates should be appointed to the Fire Department and that no employment quotas should be imposed, and

WHEREAS, pursuant to Administrative Regulation 13 the defendants are committed to the concept of well-integrated departments at all levels of municipal government.

NOW THEREFORE, it is agreed by and between the parties and now therefore, it is Ordered and Adjudged that:

1. The defendants shall begin immediately the process required to validate all employment qualifications, requirements, and examinations for the Toledo Fire Department consistent with EEOC guidelines 29 C.F.R. §§ 1607–1, 1607.14. The validation procedures shall be of a quality to insure that such qualifications, requirements, and examinations used in the fire selection process do not discriminate against Blacks, Mexican-Americans, or any other person and that the results obtained will provide a reasonable prediction of job performance within the Toledo Fire Department.

2. The plaintiffs shall have the right to engage an impartial and professionally qualified expert on the construction and administration of tests of ability to assist the personnel technician(s) of the Civil Service Commission and Toledo Fire Department. A reasonable fee for the services of the expert shall be paid by the City of Toledo. The plaintiffs expert shall:

(a) Prior to the administration of any examination consult and meet with Civil Service officials to assist in the selection of areas and appropriate types of questions, and assist in the development of a job-related examination, subject to the limitation that he shall not view the actual questions prior to the administration of the examination.

(b) Subsequent to the administration of any entrance level examination for firemen, and prior to the grading thereof, plaintiff's expert shall have the right to review the examination and challenge any question thereon as to its *job-relatedness and/or relevance*. No question shall be graded which defendants' personnel technicians and plaintiff's expert agree is not a job-related and/or relevant question.

3. If a disagreement as to the inclusion for grading of a particular question arises, such question may be submitted to the court, under seal, together with brief statements of reasons for inclusion or exclusion, for an in camera examination and ruling.

4. Together with administering a validated test defendants shall, after consultation with plaintiffs, submit to this court within 90 days after the entry of this order a comprehensive plan of affirmative recruitment, and hiring procedures to assure equal employment opportunities for Blacks and Mexican-Americans. Such plan shall include but not be limited to:

(a) A comprehensive Affirmative Action and minority recruitment program utilizing minority firefighters already employed by the Toledo Fire Department, the media, including radio, television, and newspaper communications, existing minority oriented groups, organizations, and educational institutions, calculated to apprise the minority community of the availability and ad-

vantages of employment with the Toledo Fire Department.

(b) It shall be the goal of this Affirmative Action and minority recruitment program to attract sufficient numbers of minority applicants for employment to the Fire Division of the City of Toledo so that within five (5) years from the date of this Order, the ratio of minority employment within the Fire Division reasonably reflects the ratio of each minority group to the total population of the City of Toledo (for the purposes of this Order the term "each minority group" refers to the separate groups of Black Americans and persons of Spanish descent).

(c) Administrative Regulation 13 of the City of Toledo, promulgated on March 7, 1967 shall, in its full content, apply to recruitment and appointment to the Toledo Fire Department. Once a validated test is given to a group of applicants sufficient to represent substantial progress toward the above stated goal, the Fire Department shall retain the discretion to select recruits from the resulting certified list subject to the provisions of AR 13 and in particular paragraph B(2) thereof.

5. On or about the anniversary date of this order each year until the goal stated in paragraph 5(b) of this Order is attained, the parties shall meet to review defendants' progress in meeting their Affirmative Action obligations and employment goal, and, jointly or severally submit to this court a yearly progress report.

6. This court shall retain continuing jurisdiction over this matter for the entry of such further orders as may be appropriate to effectuate the provisions of this Order, and to monitor the progress of the Defendants in meeting its Affirmative Action obligations and its stated employment goal.

We will discuss the consent decree at length later in this opinion. For present purposes, we need only note that the decree directed the city to actively recruit black and Hispanic firefighters and to establish a hiring test which was job related under EEOC guidelines. Although the decree stated that "no employment quotas should be imposed", the decree also stated that it was the goal of the minority recruitment program to achieve within 5 years a fire department which reflected the racial composition of the city as a whole.

Despite the consent decree's recitation of the city of Toledo's commitment "to the concept of well integrated departments ...", racial integration of the fire department has proceeded at a snail's pace. The Toledo metropolitan area is approximately 16% black and Hispanic. But in January of 1973, shortly after this suit was first filed, the Toledo fire department had 10 black officers out of a force of 546 authorized personnel—about 1.8%. The following table represents the progress made by the city of Toledo toward integrating its fire division:

| DATE | AUTHORIZED NUMBER OF UNIFORMED PERSONNEL | BREAKDOWN BY RACE: | | |
| | | WHITE | BLACK | HISPANIC |
| --- | --- | --- | --- | --- |
| 1/1/73 | 546 | 536 98.16% | 10 1.83% | |
| 1/1/74 | 567 | 543 95.76% | 22 3.88% | 2 0.36% |
| 1/1/75 | 583 | 553 94.85% | 26 4.46% | 4 0.69% |
| 1/1/76 | 566 | 529 93.46% | 33 5.83% | 4 0.71% |
| 1/1/77 | 576 | 540 93.75% | 32 5.56% | 4 0.69% |

| DATE | AUTHORIZED NUMBER OF UNIFORMED PERSONNEL | BREAKDOWN BY RACE: | | |
|---|---|---|---|---|
| | | WHITE | BLACK | HISPANIC |
| 1/1/78 | 576 | 537 93.23% | 33 5.73% | 6 1.04% |
| 1/1/79 | 576 | 532 92.36% | 37 6.43% | 7 1.22% |
| 1/1/80 | 572 | 523 91.43% | 42 7.34% | 7 1.22% |

This glacier-like increase in the percentage of black and Hispanic police officers obviously did not comply with the consent decree's five-year goal of having the police department reasonably represent the racial make-up of the city of Toledo.

Nor can it be said that the city of Toledo ever displayed a firm resolve to comply with the consent decree. For example, the consent decree provided that the city was to submit a comprehensive affirmative action plan to the district court within 90 days after the entry of the consent decree. The record shows that no such plan was filed until June of 1979, and only then after plaintiffs had filed a motion seeking contempt sanctions against the city.[4]

By March of 1980, the Toledo fire department was 8.21% black and 1.22% Hispanic. Unfortunately, a fiscal crisis struck Toledo. The city anticipated a fall in revenues for 1980; the city manager projected a deficit of $3.7 million. In order to avoid this deficit, which is illegal under Ohio law,[5] the city manager ordered a 7% cut in the budget of every department except the police department.[6] A 7% reduction in the budget of the fire division required the layoff of 61 firefighters.

Under a collective bargaining agreement between the intervenor firefighters' union

4. There have been extensive proceedings in the district court since the consent decree was entered. The record reveals that the plaintiff moved for a contempt order and for modification of the consent decree in May of 1977. After much procedural wrangling and after being prodded by Judge Young, the parties on March 20, 1978, agreed on a partial settlement of disputed issues. The city agreed to conduct an extensive minority recruitment program, as specifically outlined in the settlement.

On May 1, 1979, a settlement of contempt issues was filed. This agreement extended the consent decree until December of 1983, and contained a revised affirmative action goal. This document provided:

Defendants will adhere to the following goals and timetables:

| 12/77 | 3/78 | 12/78 | 12/79 | 12/80 | 12/81 | 12/82 | 12/83 |
|---|---|---|---|---|---|---|---|
| 36 | 36 | 42 | 50 | 58 | 63 | 70 | 80 |

The settlement also provided for the further reopening of the consent degree for readjustment of the goals and timetables if there was a change in fire division appointments and if the 1980 census revealed a change in Toledo's minority population.

Additional modifications to the consent decree were agreed to on June 14, 1979. It was on that date that a formal minority recruitment program was made part of the consent decree. This document stated that:

The objective of the city of Toledo shall be to achieve at least 14% black and 3% Spanish representation in both the police division and fire division uniform[ed] personnel by 1981. If this goal is not achieved by 1981 in the police division or fire division, the city of Toledo agrees to extension of the decree covering the division or divisions where the goal has not been achieved.

On September 11, 1979, the parties agreed on an enforcement order under which all black and Hispanic applicants for positions with the Toledo fire division who had scored above a certain percentage on the entrance exam were certified for appointment.

5. See Ohio Rev.Code Ann. § 5705.39.

6. The proffered reason for exempting the police department from cutbacks was that it was already undermanned.

and the city,[7] and under Ohio law,[8] layoffs must be made strictly on the basis of seniority. Most of the black and Hispanic firefighters in Toledo have been recently hired under the consent decree. They have little seniority. Thus, the effect of laying off 61 firefighters on the basis of seniority was to significantly deplete the ranks of black and Hispanic firefighters.

The layoffs had a devastating effect on the slow progress which the Toledo fire department had made toward integration. As a result of the layoffs, nearly one-half of the blacks and Hispanics hired since the consent decree was entered were laid off. The percentage of black firefighters in the department fell to 5.48%; the percentage of Hispanic firefighters fell to .78%.

Understandably alarmed, the plaintiffs then filed a motion in the district court to enjoin the layoff of the minority firefighters. Judge Young held a complete hearing on the motion, and permitted the Firefighters Local Union 92 to intervene as a party defendant. In a thoughtful and well-reasoned opinion, Judge Young concluded that the layoff of minority firefighters would violate the consent decree. Accordingly, he enjoined the city from reducing the number of minority uniformed personnel in the fire division below 8.21% black and 1.22% Hispanic.[9] The defendants have appealed.

## I

A consent decree is a strange hybrid in the law. It is a contract that has been negotiated by the parties. It is also a court order which can be changed by a court if circumstances warrant. We think that the district court's order is sustainable under both rationales. As Judge Young noted below, there are no disputed issues of fact in this case. The first question presented is whether the consent decree bars the layoff of minority firefighters. We agree with Judge Young that it does.[10]

## A

■ We begin with the premise that "since consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts." *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 934, 43 L.Ed.2d 148 (1975). *See also United States v. Armour & Co.*, 402 U.S. 673, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); *N.Y.S. Ass'n. for Retarded Children v. Carey*, 596 F.2d 27 (2d Cir. 1979).

We think that the consent decree imposed a duty upon the city to inaugurate and maintain affirmative action.

First, the terms of the consent decree mandate affirmative action in hiring. The decree states that the city of Toledo wished to "erase any vestiges of past employment discrimination", and that the city was committed to the concept of well-integrated departments at all levels of municipal

---

7. At the time of the hearing below, the prior collective bargaining agreement had expired and no final agreement had been reached on a new contract. Thus, the district court's order was not in contravention of an existing collective bargaining agreement. The intervenors contend that they and the city regarded the seniority provisions of the old contract as still in effect. However, there is no evidence or finding below to this effect. In any event, for reasons outlined below in part IV, we do not think that it makes a difference whether a collective bargaining agreement is in effect or not.

8. Ohio Rev.Code Ann. § 124.37 provides:

When it becomes necessary in a police or fire department, through lack of work or funds, to reduce the force in such department, the youngest employee in point of service shall be first laid off.

9. These percentage figures represented the racial composition of the department in March of 1980, immediately before the layoffs.

10. This case is an appeal from the granting of a preliminary injunction. We must weigh whether the plaintiffs have shown a strong possibility of success on appeal, whether plaintiff or defendant would suffer irreparable harm and whether the public interest warrants the injunction. *See e. g. Mason County Medical Ass'n. v. Knebel*, 563 F.2d 256, 261 (6th Cir. 1977). Our standard of appellate review is whether the district court abused its discretion in granting the preliminary injunction. *United States v. School District of Ferndale*, 577 F.2d 1339, 1360 (6th Cir. 1978).

government. Importantly, the decree provided that the goal of the affirmative action measures ·mentioned therein was to have "the ratio of minority employment within the fire division reasonably reflect the ratio of each minority group's total population of the city of Toledo." This goal was to be achieved within five years. Significantly, the decree gave the district court continuing jurisdiction "for the entry of such further orders as might be appropriate to effectuate the provisions of this order, and to monitor the progress of the defendants in meeting its affirmative obligation and *its stated employment goal*." (emphasis added)

Although the consent decree could have been drafted with more precision, we think it clear that, in agreeing to the settlement, the city of Toledo was committing itself to prompt integration of the fire division. The consent decree reflects the city's concern that it not be required to hire specific numbers of minority group members at any given time. However, the decree commits the city to complete integration of the fire division within five years of its entry.[11]

■ The object of the consent decree is to desegregate the fire division. This was the understanding of Judge Young, who had to approve the consent decree in the first place.[12] This was also the understanding of another panel of the court, which reviewed a near identical consent decree entered in *Sarabia v. Duck, supra*, a companion case to this one. In *Sarabia v. TPPA*, 601 F.2d 914 (6th Cir. 1979), this court reviewed the companion consent decree which had the same provisions as this consent decree. This court concluded that "... the entire thrust of the decree is to-

ward affirmative action to achieve a well-integrated department." 601 F.2d at 918.

■ We agree with the plaintiffs and with Judge Young that permitting the city to lay off the recently-hired minority firefighters would make a mockery of the consent decree. By its very terms, compliance with the decree is measured by black and Hispanic *employment* in the fire division. The consent decree did not mandate a certain percentage hiring of minorities. The decree left hiring decisions largely to the city. What mattered was the end result—how many minorities were employed.

As we have previously noted, the city of Toledo did not come close to complying with the consent decree's five year minority employment goal. However, some progress has been made. The layoffs devastated that progress. As Judge Young noted, the consent decree required affirmative action, not negative action or no action. The layoffs represent negative action which violates the city's express commitment in the consent decree.

B

■ Leaving aside our above-styled analysis, we think that the district court's order is justified solely by paragraph 6 of the consent decree. That paragraph provided:

This court shall retain continuing jurisdiction over this matter for the entry of such further orders as may be appropriate to effectuate the provisions of this Order, and to monitor the progress of the Defendants in meeting its Affirmative Action obligations and its stated employment goal.

11. The city's commitment to integration of the fire division is further illustrated by the modifications to the consent decree agreed to by the parties in May and June of 1979. See n.4, *supra*. These modifications were made after the initial five-year goal was not met. They firmly commit the city of Toledo to steady, gradual integration of the fire department by 1983.

12. We think that Judge Young's views deserve deference. It is true that our review of his interpretation of the consent decree is free of

the "clearly erroneous" standard of review. *See Eaton v. Courtaulds of North America, Inc.*, 578 F.2d 87, 90 (5th Cir. 1978). However, as the Supreme Court noted in *United States v. ITT Continental Baking Co.*, 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975), all relevant aids to contract interpretation could be used. Few persons are in a better position to understand the meaning of a consent decree than the district judge who oversaw and approved it.

As indicated above, the city of Toledo agreed to a five-year goal to achieve complete integration of its police and fire departments. When this goal was not met, paragraph 6 of the consent decree gave Judge Young broad and explicit authority to enter orders so that the goal could be achieved. The order entered in this case was well within this authority.[13]

We regard the district court's enjoining the layoff of minorities as necessary action to implement the consent decree. A directly analogous case is *Sarabia v. Toledo Patrolman's Assoc.*, 601 F.2d 914 (6th Cir. 1979). As we have already noted, the consent decree in *Sarabia* is in all significant aspects identical to the consent decree before us. In *Sarabia*, this court affirmed Judge Young's action, under the consent decree, in suspending the operation of a municipal rule under which appointments to the police department were to be made from the top three applicants on the police department hiring list. Judge Young suspended the rule to allow the city to hire additional black officers who were qualified, but not at the top of the hiring list. This court held that this action was proper to effectuate the consent decree.

We think that *Sarabia's* analysis controls here. In *Sarabia*, the municipal rule in question was eliminating qualified blacks from consideration for appointment to the police department. The consent decree was silent as to what procedure was to be used to select police officers. Despite the consent decree's silence on the issue, this court concluded that "it was within the power of the district court to suspend a civil service rule whose application prevented achievement of the stated goal of the consent decree." *Sarabia, supra*, 601 F.2d at 918.

In this case, the effect of the layoffs is to thwart integration of the fire division, as mandated by the consent decree. Under the rationale of our decision in *Sarabia*, the district court retained broad authority to

make sure that nothing interfered with the implementation of the consent decree. As in *Sarabia*, where the decree said nothing about a municipal hiring rule, the decree in this case is silent about the effect of layoffs. As in *Sarabia*, we believe that the district court acted well within its authority in preventing interference with the consent decree.

## II

For the reasons outlined above, we think that in viewing the consent decree solely as a contract, the decree gave Judge Young the explicit authority to act as he did. However, assuming that the decree itself did not allow him to enjoin the layoffs, we also think that Judge Young had inherent authority to modify the consent decree.

The leading case concerning the modification of consent decrees is *United States v. Swift & Co.*, 286 U.S. 106, 114–5, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932):

[A] court does not abdicate its power to revoke or modify its mandate if satisfied that what it has been doing has been turned through changing circumstances into an instrument of wrong. We reject the argument for the intervenors that a decree entered upon consent is to be treated as a contract and not as a judicial act. A different view would not help them, for they were not parties to the contract, if any there was. All the parties to the consent decree concede the jurisdiction of the court to change it. The intervenors gain nothing from the fact that the decree was a contract to others, if it was not one as to them. But in truth what was then adjudged was not a contract as to any one. The consent is to be read as directed toward events as they then were. It was not an abandonment of the right to exact revision in the future, if revision should become necessary in adaptation to events to be.

**13.** As was noted in n.4, *supra*, the parties have stipulated to various modifications of the original consent decree. These stipulations were reached under Judge Young's guidance. Judge Young's wise handling of this case and his ever-present efforts to reach a satisfactory resolution of difficulties is clear on this record.

Additional authority is contained in *United States v. Atlantic Refining Co.*, 360 U.S. 19, 79 S.Ct. 944, 3 L.Ed.2d 1054 (1959) and *Hughes v. United States*, 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394 (1953). In both of these cases the Court concluded that the consent decree in question could not be reasonably construed to justify the relief requested by the plaintiff. However, in each case, the Court was careful to note that the decree could be modified so as to grant the requested relief. Modification, of course, would require a complete hearing and findings of fact. 360 U.S. at 23, 79 S.Ct. at 946; 342 U.S. at 357–58. *See also System Federation v. Wright*, 364 U.S. 642, 81 S.Ct. 368, 5 L.Ed.2d 349 (1961) (directing modification of a consent decree where the statute on which the consent decree was based was changed); *United States v. Georgia Power Co.*, 634 F.2d 929 (5th Cir. 1981) (citing cases) (discussing modification of a decree because of intervening change in case law).

■ In this case, the consent decree committed the city of Toledo to affirmative action. The five year goal contained in the consent decree was not met. The layoffs threatened to destroy any affirmative action progress. The district court thus had inherent authority to act in response to these changed events.

The district court's belief that past discrimination had clearly occurred and that all parties thought that the department would be easily integrated in five years provide additional support for modification of the consent decree.[14] Nor is there anything in the consent decree in opposition to this view. The decree is silent about layoffs.

Judge Young's findings clearly support modification.[15] We emphasize that this is an appeal from the granting of a preliminary injunction and that our standard of review is whether the district court abused its discretion in granting the injunction.[16] The district court will have the opportunity to more fully consider the modification issue at a plenary hearing. For purposes of this appeal, the district court's findings amply justified the issuance of a preliminary injunction.[17]

14. In his opinion below, Judge Young stated: When the consent decree was entered it was expected that no real problems would be encountered in recruiting minority policemen and firefighters within the five year period. The records in the cases show how wrong these expectations were.

This view finds additional support in paragraph 5 of the consent decree which provides for annual meetings and progress reports, and in the subsequent modifications agreed to by the parties. *See* n.4, *supra.* Thus, this case presents a classic example of an agreement reached in harmony and good will which breaks down in actual practice.

15. In his opinion below, Judge Young stated that "the decree clearly and expressly designed to desegregate the fire division, and that is a purpose of sufficient scope to include a multitude of means and measures ... While paragraph 6 of the consent decree reserves a continuing jurisdiction in the court to enter further orders appropriate to effectuate the provisions of the decree, the court has that jurisdiction anyway."

16. *See* n.10, *supra.*

17. We recognize that a motion to modify a consent decree, technically brought under F.R. Civ.Pro. 60, is extraordinary relief. *See United*

*States v. Work Wear*, 602 F.2d 110 (6th Cir. 1979); *U. S. Steel Corp. v. Frat'l Ass'n. of Steel Haulers*, 601 F.2d 1269, 1273–74 (3rd Cir. 1979); *Mayberry v. Maroney*, 558 F.2d 1159, 1163 (3d Cir. 1977). We think that there is strong evidence in the record that failure to modify this decree would convert it into "an instrument of wrong." *United States v. Swift & Co.*, 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932).

We find particularly impressive the discussion contained in *Philadelphia Welfare Rights Org'n v. Shapp*, 602 F.2d 1114 (3d Cir. 1979). There the Third Circuit affirmed the district court's modification of a consent decree where the original obligations in the consent decree proved impossible for the defendant to meet. We endorse Judge Gibbons' analysis:

Any injunction imposing mandatory affirmative duties for the future involves elements of prediction. Whether the prediction as to achievability is made as a result of litigation or, as here, in a negotiated settlement, it will always be speculative to some degree. This is particularly the case when the defendants' ability to achieve compliance depends upon the receptivity of class members or other third parties not formally before the court. See Special Project, The Remedial Process in Institutional Reform Litigation, 78 Col.L.Rev. 784, 818–19 (1978). An approach to the

### III

The defendants rely heavily upon our decision in *Youngblood v. Dalzell*, 568 F.2d 506 (6th Cir. 1978). There, a consent decree had been entered in settlement of a discrimination suit brought against the Cincinnati fire department. The decree provided for specific hiring goals to increase the number of minority firefighters. When the city was forced to lay off firemen, because of economic difficulties, the plaintiffs in *Youngblood* sought to prevent the layoff of minority firemen. This court affirmed the district court's denial of relief, despite the effect that the layoffs would have on the consent decree's minority hiring goals.

In both *Youngblood* and this case, consent decrees were entered which contained affirmative action requirements. Both consent decrees were silent concerning layoffs. However, we do not find *Youngblood* con-

trolling here. The reason is that the wording of the consent decree in this case is far different from that in *Youngblood*. We have already discussed the wording of the consent decree in this case, which, we think, imposes a duty upon the city of Toledo to integrate its fire division.

In *Youngblood* the consent decree contained no language which imposed an affirmative action duty upon the city of Cincinnati. Indeed the city specifically denied any past discrimination, and only conceded that some of its past practices could give rise to an inference of discrimination.[18] The consent decree in this case contains none of the exculpatory language used in the *Youngblood* consent decree.

Moreover, the factual circumstances which led to the signing of the consent decree in this case were far different than the situation in *Youngblood*. As the Su-

---

modification of a complex affirmative injunction which over-emphasized the interest of finality at the expense of achievability would inevitably make defendants wary of any decree imposing more than the bare minimum of affirmative obligation. That wariness would, we think, tend to discourage the settlement of injunction actions by consent decree, a high price to pay for the benefits of finality. Even where the decree is litigated, if the power to modify were too closely curtailed the defendants might seek, and the courts might tend to impose, minimum affirmative obligations, perhaps less than realistically achievable, for fear of becoming bound by unreasonable but unchangeable requirements. Where an affirmative obligation is imposed by court order on the assumption that it is realistically achievable, the court finds that the defendants have made a good faith effort to achieve the object by the contemplated means, and the object nevertheless has not been fully achieved, clearly a court of equity has power to modify the injunction in light of experience.
602 F.2d at 1120–21.

*See also King-Seeley Thermos Co. v. Alladin Ind., Inc.*, 418 F.2d 31, 35 (2d Cir. 1969) ("While changes in fact or in law afford the clearest basis for altering an injunction, the power of equity has repeatedly been recognized as extending also to cases where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes") (citing cases).

The present situation is also similar to that where a district court finds a defendant guilty of unlawful discrimination, but withholds pref-

erential numerical relief pending the outcome of less drastic remedies. If the lesser remedies do not achieve integration, the district court retains the option to impose more severe remedies. *See e. g. Dawson v. Pastrick*, 600 F.2d 70, 77 (7th Cir. 1979). *See also Morrow v. Crisler*, 491 F.2d 1053 (5th Cir.) (en banc), *cert. denied*, 419 U.S. 895, 95 S.Ct. 173, 42 L.Ed.2d 139 (1974) (ordering preferential numerical relief for the Mississippi Highway Patrol where less drastic sanctions ordered by district court were insufficient to integrate the department).

**18.** The decree in *Youngblood* stated that:

The defendants deny that they have heretofore engaged in any pattern or practice of discrimination in recruiting, testing, selecting, and hiring fire recruits or in promoting firemen on the basis of race but realize that certain practices of the Division of Fire, Department of Safety and the Civil Service Commission of the City of Cincinnati, Ohio, may give rise to an inference that such pattern or practice may have occurred. For the purpose of avoiding any such inference, the defendants have heretofore taken certain steps and promulgated certain policies intended to increase the availability and selection of qualified minority applicants for employment and promotion, and, for the same purpose and with the same intent, and being desirous of implementing a solution to the subject matter of this action without the expense of litigation, are now willing to agree to the entry of a consent decree providing for additional measures to be taken.
*Youngblood, supra*, 568 F.2d at 507.

preme Court explained in *United States v. ITT Continental Baking Co., supra*, at 238, 95 S.Ct. at 935, "[s]ince a consent decree or order is to be construed for enforcement purposes basically as a contract, reliance upon certain aids to construction is proper, as with any other contract. Such aids include the circumstances surrounding the formation of the consent order . . ." *See Robertson Class Plaintiffs v. NBA*, 625 F.2d 407 (2d Cir. 1980).

As indicated, the consent decree in this case was identical to a consent decree entered in *Sarabia v. Duck*, a companion case involving discrimination in hiring in the Toledo police department. Yet, the *Sarabia* consent decree was entered only after this court had strongly upheld a finding of discrimination in hiring police officers in *Afro-American Patrolman's League v. Duck, supra*.[19] Against this background, it is clear that the city of Toledo was capitulating to judicial findings of past discrimination. The city did not choose to distinguish past hiring practices in the fire department from past hiring practices in the police department. The city agreed to the same consent decree in both cases. Thus, an examination of "the circumstances surrounding the order and the context in which the parties were operating" *ITT Continental Baking, supra*

at 243, 95 S.Ct. at 938, reveals why the city of Toledo agreed to the consent decree.

It misses the mark to argue, as do the intervenors, that it would have made no sense for the city to concede liability in a consent decree. By agreeing to the consent decree, the city was able to define and limit its affirmative action obligations. Had the case gone to trial, the district court may well have ordered the city to institute one-for-one black-white hiring until the department became fully integrated. The city was opposed to this form of relief, and was able to avoid the possibility of this type of obligation by agreeing to a consent decree.

In fact, so clear was the existence of past discrimination, that Judge Young, in his opinion, stated:

> The consent decree was entered because in spite of the careful professional efforts of skilled attorneys to avoid admitting that which could not truthfully be denied, there was no doubt that members of racial minorities were excluded from the police and fire division.[20]

Examination of the decree and the circumstances under which it was entered compels a conclusion that the city agreed that it had a constitutional duty to eradi-

---

19. *See* n.3, *supra*.

20. The defendant city and defendant intervenor attack this statement by Judge Young. They argue that there was no trial, and no adjudication as to liability. This argument is disingenuous.

The city is an adjudicated discriminator against minorities in the police department. The consent decree concedes liability and mandates integration of the fire department. As indicated, a companion consent decree mandates integration of the Toledo police department. Moreover, at the time this suit was filed, the department was less than 2% minority despite the fact that Toledo was approximately 16% minority. The defendants offered no explanation for these bleak figures. In *Teamsters v. U.S.*, 431 U.S. 324, 338–39 and n.20, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977), the Supreme Court noted that statistics indicating racial imbalance are often "a telltale sign of purposeful discrimination." The Court explained that "absent explanation, it is ordinarily to be expected that nondiscriminatory hiring practices will in time result in a work force more or less representative of the racial and ethnic composition

of the population of the community from which employees are hired." 431 U.S. at 340 n.20, 97 S.Ct. 1856 n.20. This court has noted the strong evidentiary value of statistics indicating gross underrepresentation of minorities. *DPOA v. Young*, 608 F.2d 671, 787–90 (6th Cir. 1979); *Afro-American Patrolman's League v. Duck, supra*, 503 F.2d at 299–300. In this case not only is there no explanation for the gross underrepresentation of minorities in the Toledo fire department, the consent decree provides for the development of a job-related hiring examination—an implicit concession that previous examinations were not job-related. The use of non-job related examinations which result in low minority hiring is relevant evidence of intentional discrimination. *DPOA v. Young, supra*, 608 F.2d at 692–93.

Given the nature of the evidence in this sparse record, it is very clear why the city of Toledo agreed to a consent decree. It is intellectually dishonest for the city to now argue that there was no evidence that it discriminated against minorities.

cate discrimination in the hiring of fire-fighters. The only issues in question were the specific steps the city would take to integrate the fire department. That was what the consent decree in this case was all about. The consent decree in *Youngblood* was very different from that here, and that case's holding is thus inapplicable.

Aside from this, however, the *Youngblood* court did not address the question of modification of the consent decree because that issue was not presented. Thus, even if *Youngblood* is controlling under a contract theory, it does not affect a district court's discretionary authority to modify a consent decree. As we have noted in part II above, the record in this case supports Judge Young's modification of the decree.

### IV

There is one additional issue which must be considered. Judge Young enjoined the city from reducing the numbers of minority uniformed personnel in the fire division below the minority percentage ratios as they stood on March 23, 1980, that is 8.21% black and 1.22% Hispanic. Judge Young's order, then, did not prohibit all minority layoffs, but required that the layoffs be proportional to minority representation within the fire department.

The intervenor union argues that the district court's order contravenes both Ohio law [21] and the terms of its collective bargaining agreement with the city.[22] The union further argues that this is contrary to *Teamsters v. United States*, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) and *United Air Lines v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977).[23]

Initially, we note that nothing in Judge Young's order requires the city to violate either Ohio law or the collective bargaining agreement. The city can simply decline to lay off firefighters altogether by balancing its budget by cutbacks in other areas. However, to the extent that the city chooses to lay off firefighters, the district court's order requires that the layoffs be made in such a way as to violate the strict seniority requirements of the collective bargaining agreement and Ohio law.

The plaintiffs have argued that the city can balance its budget by not laying off any firefighters. Plaintiffs suggest such alternatives as furloughs and elimination of other, arguably less necessary services. However, we do not think that federal judges should second-guess the budgetary decisions of elected officials. The elected officials of Toledo obviously believe that they must lay off firefighters. Thus, we must address the question whether the district court can override the collective bargaining agreement and Ohio law.

We think it clear that the district court can do so. For reasons outlined above, Judge Young's order was well within the scope of his authority under the consent decree. The broad remedial power of a federal court was noted in *Sarabia, supra,* where this court approved the district court's suspension of a state statute which interfered with a consent decree.

A federal court's power under the Supremacy Clause to override conflicting state laws and/or private agreements is well established. See e. g. *Swann v. Charlotte-Mecklenburg Bd. of Ed.*, 402 U.S. 1, 15, 91 S.Ct. 1267, 1275, 28 L.Ed.2d 554 (1971); *Bradley v. Milliken*, 433 F.2d 897 (6th Cir. 1970) (subsequent history of case omitted); *Sarabia, supra.*

Thus, we believe that the district court can override the seniority provisions of Ohio

21. See n.8, *supra.*

22. See n.7, *supra.*

23. The union also argues that no relief can be entered which affects it and the collective bargaining agreement to which it was a party. We initially note that no collective bargaining agreement is currently in effect. See n.7, *supra.* More important, the union has now moved to intervene, and is a proper party defendant. The fact that the union was not a party to the original lawsuit does not preclude its subsequent joinder for the purposes of entry of additional relief. Since the union is now properly joined, the district court has authority to enter appropriate relief. See 3B Moore's Federal Practice § 24.16[6].

law. Nor do we believe that *Teamsters* mandates a different result. In *Teamsters*, the Court held that a bona fide seniority system was immune to attack under Title VII of the Civil Rights Act of 1964, even if it perpetuated past discrimination. The instant case was not brought pursuant to Title VII, it was brought pursuant to 42 U.S.C. §§ 1981 and 1983. Leaving aside the question as to whether *Teamsters* applies to § 1981,[24] we do not think that *Teamsters* can bar relief sought to remedy constitutional violations under § 1983, or under a consent decree. While a bona-fide seniority system may not itself violate the law, such a system cannot be allowed to obstruct remedies designed to overcome past discrimination. *See Bolden v. Penn. State Police*, 578 F.2d 912, 920–21 (3d Cir. 1978). To the extent that the seniority system is an obstacle to the city of Toledo's duty to eliminate past discrimination, the district court can set it aside.[25]

## CONCLUSION

The record reveals the long torturous path which minorities have had to tread to achieve equality in Toledo. In 1974, when the consent decree was entered in this case it looked like final justice had been achieved. Unfortunately, this appeal demonstrates that there is still a long way to go.

Judge Young has handled this case and its related companion cases from the beginning. He has, in the highest tradition of the federal judiciary, at all times displayed sound reasoning, restraint, and wisdom in his actions. We think that he ruled correctly here.

The judgment of the district court is affirmed. The stay heretofore entered in this case is vacated effective the day this opinion is filed.

BAILEY BROWN, Circuit Judge (concurring in the result.)

I concur in the affirmance of the entry of the preliminary injunction by the district court prohibiting layoffs that would reduce the proportion of minority firefighters in the Toledo fire department. I would, however, reach this result on only one of the theories upon which Judge Keith relies.

I disagree with Judge Keith's opinion as to its holding that this consent decree, properly construed, prohibited layoffs on the basis of seniority. This consent decree is absolutely silent with respect to layoffs. In order to construe it to proscribe layoffs on the basis of seniority in spite of its silence, we have to construe it by implication to provide that the City of Toledo was to forego the right to lay off at all unless it laid off other than on the basis of seniority in which case it would be laying off contrary to its collective bargaining contract and the Ohio statute (O.R.C. § 124.37). To me, this is not a reasonable construction of the consent decree. On the contrary, if layoffs had been within the contemplation of the parties at the time they negotiated

24. *Compare Johnson v. Ryder Truck Lines, Inc.*, 575 F.2d 471 (4th Cir. 1978), *cert. denied*, 440 U.S. 979, 99 S.Ct. 1785, 60 L.Ed.2d 239 (1978) and *Pettway v. American Cast Iron Pipe Co.*, 576 F.2d 1157, 1191 n.37 (5th Cir. 1978), *cert. denied*, 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979), with *Bolden v. Penn State Police*, 578 F.2d 912, 920–21 (3d Cir. 1978). We express no view on this issue.

25. We emphasize that Judge Young has broad authority to shape a final remedy. In doing so, he can and should take into account the interests of innocent white firefighters who are or would be affected. *See DPOA v. Young, supra.* Judge Young has been sensitive to the problems of both parties throughout this litigation. Indeed, in granting the preliminary injunction,

he merely ordered the city of Toledo to maintain the integration progress it had made.

We also note that it is in the union and city's best interest to agree on furloughs and/or wage reductions in order to avert layoffs. The Toledo City Manager stated that the union would not agree to do this and would not even agree to defer a wage increase. We find the union's refusal disturbing. Where large numbers of union members scheduled for layoff are members of a racial minority, a union's refusal to take pay cuts to avert layoffs is significant, *prima facie* evidence of racial discrimination. This is especially true in a situation where the laid-off minorities were recently hired under an affirmative action plan and/or where the union has opposed affirmative action.

and submitted the consent decree, such would have been covered in the decree.

Further, with respect to the interpretation of the consent decree, I disagree with Judge Keith's opinion in its application to this question of the opinions of this court in *Youngblood v. Dalzell*, 568 F.2d 506 (6th Cir. 1978) and *Sarabia v. T.P.P.A.*, 601 F.2d 914 (6th Cir. 1979). The holding in *Youngblood* supports the proposition that the consent decree, being silent as to layoffs, does not proscribe layoffs by seniority. *Sarabia* is not applicable here since there the court was applying the consent decree to hiring practices, a matter that was expressly covered by the consent decree.

On the other hand, I agree with Judge Keith's opinion as to its holding that, even if layoffs by seniority were not proscribed by the consent decree as originally entered, the district court had the authority to, in effect, modify the consent decree to proscribe layoffs by seniority. This is true since the district court held an evidentiary hearing and determined that such was necessary, due to changed circumstances, to carry out the expressed purpose and goal of the consent decree. Actually, it is not absolutely clear whether the district court considered that it was reaching this result by construing the consent decree, or whether it considered that it was reaching this result by modifying the consent decree in order to accomplish the stated purpose and goal of the consent decree. It is clear, however, that the district court based its decision to enter the preliminary injunction on facts and circumstances, developed at the hearing, that existed at the time it made its decision. These included the financial problems of the City and the lack of progress that had been made in accomplishing the purpose of the consent decree.

As does Judge Keith, I believe that the district court's authority to modify the consent decree is supported by *United States v. Swift*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), and *Hughes v. United States*, 342 U.S. 353, 72 S.Ct. 306, 96 L.Ed. 394 (1952). The teaching of these cases is that, even where a consent decree is entered, as here, without a determination of liability, the court may later modify the decree in the light of changed circumstances to carry out the expressed purpose of the decree.[1]

■ Because the City is being required to pursue a course of action that it has not, by the consent decree, contracted to follow, and because liability has never been established, it seems to me that the district court should take particular care to exercise judicial restraint in modifying the consent decree to overrule the decision of the elected City officials and their appointees concerning the proper way to meet this financial crisis. *National League of Cities v. Usery*, 426 U.S. 833, 96 S.Ct. 2465, 49 L.Ed.2d 245 (1976). Nonetheless, on the question before this court, which is whether the district court erred in issuing the preliminary injunction, I cannot, on this record, conclude that it acted arbitrarily.

■ I do not believe that, to affirm the issuance of this preliminary injunction, it is necessary for this court to hold, as does Judge Keith's opinion, that the district court's decision, pursuant to the Supremacy Clause, overrides the Ohio statute and the collective bargaining contract requiring layoffs by seniority. The district court's decision does not authorize layoffs on a basis other than seniority and does not even purport to affect contract rights between the Union and the City. What the district court did, after considering all of the facts (including the existing financial crunch, the current options that the City had with respect to cutting costs, and the slow progress in meeting the goal of the consent decree)

---

1. Plaintiffs argue that the consent decree, properly construed, concedes liability, and the district court, in its memorandum granting the preliminary injunction, seems to assume that liability has been established. I do not, however, construe the consent decree to concede liability with respect to the fire department, and there has never been an evidentiary hearing and determination of such liability by the district court. However, as stated in the body of my concurrence, the authority of the district court to modify the consent decree is not dependent on the establishment of liability.

was to determine only that the City should be preliminarily enjoined from laying off in such a way that would reduce the proportion of minority persons in the fire department. Thus, the City may, under the injunction, refrain from laying off in the fire department and seek savings in other areas or it may, if it chooses, lay off on a proportional basis and face whatever legal consequences that may flow from such action.

In my view, even though this action was brought pursuant to 42 U.S.C. §§ 1981 and 1983 and not pursuant to Title VII, the district court did not have the authority, when it issued the preliminary injunction, to abrogate the contract and statutory rights of the Union to layoffs by seniority. The Union, although it had existing contract and statutory rights to layoffs by seniority, was not a party to this litigation when it was filed and when the consent decree was entered. Therefore, its rights vis-a-vis the City were not affected by the consent decree. Although it intervened at the time plaintiffs moved for the instant preliminary injunction, there was, again, no determination of liability in this proceeding, and the Union's position was that the district court could not and should not authorize layoffs on a basis other than seniority. The district court did not so authorize layoffs. The district court could abrogate the rights of the Union to layoffs by seniority, as required by its contract and the Ohio statute, only in a proceeding in which the Union was a party, and in which there was a determination that: (1) plaintiffs' constitutional rights had been infringed; and (2) it was necessary, to vindicate plaintiffs' constitutional rights, to hold such contract and statutory rights of the Union to be unenforceable.