**THOMASVILLE FURNITURE INDUSTRIES, INC.,**
**Appellant,**

v.

**THE ELDER–BEERMAN STORES, CORPORATION, Appellee.**

No. C–3–97–183.
Bankruptcy No. 95–33643.
Adversary No. 96–3047.

United States District Court,
S.D. Ohio,
Western Division.

Sept. 28, 1998.

William B. Sullivan, Winston–Salem, NC, for Thomasville Furniture Industries Inc., appellants.

Richard Alan Chesley, Jones Day Reavis & Pogue–2, Columbus, for Elder–Beerman Stores Corporation, appellees.

DECISION AND ENTRY AFFIRMING IN PART AND REVERSING IN PART THE DECISION AND JUDGMENT OF THE UNITED STATES BANKRUPTCY COURT FOR THE SOUTHERN DISTRICT OF OHIO, WESTERN DIVISION, DATED FEBRUARY 12, 1997, AWARDING LOST PROFIT DAMAGES AND ATTORNEY'S FEES AS COMPENSATORY CIVIL CONTEMPT DAMAGES FOR VIOLATION OF THE AUTOMATIC STAY; CAPTIONED CAUSE REMANDED TO THE UNITED STATES BANKRUPTCY COURT; TERMINATION ENTRY

RICE, Chief Judge.

Pending before the Court is an appeal of a decision and judgment by the United States Bankruptcy Court for the Southern District of Ohio, dated February 12, 1997, awarding lost profits and attorney fees to Elder–Beerman Stores Corp. ("Elder–Beerman") as compensatory civil contempt damages for violation of the automatic stay by Thomasville Furniture Industries, Inc. ("Thomasville"). The Chapter 11 debtor in this case is Elder–Beerman, a department store chain and, significant to this appeal, a long-time vendor of furniture by Thomasville. Prior to arriving in this Court, the parties involved have litigated a number of issues before the Bankruptcy Court. Accordingly, this Court will briefly set forth the procedural history of this case before addressing the substance of the appeal before it.

## I. *Background*

Elder–Beerman and Thomasville had an on-going business relationship for a period of time in excess of thirty-five years. Elder–Beerman was the primary retailer of Thomasville furniture in the Dayton area, and Thomasville was the manufacturer of the principal furniture line sold by Elder–Beerman. The two companies had an at-will contract, providing that either party might terminate their relationship at any time.

On October 17, 1995, Elder–Beerman filed a Petition for Bankruptcy in the United States Bankruptcy Court for the Southern District of Ohio. Elder–Beerman immediately notified Thomasville of the filing. Thomasville responded by suspending shipment of all orders until it received $300,000 from Elder–Beerman to secure post-Petition credit sales. The suspension lasted until November 10, 1995. Following the filing of the bankruptcy, the relationship between Elder–Beerman and Thomasville deteriorated. The extent and result of this change was the focus of the proceeding leading to this appeal. In January, 1996, Thomasville notified Elder–Beerman that it was terminating their relationship, effective sixty days from that date.

On March 14, 1996, Elder–Beerman initiated the Adversary Proceeding at issue, No. 96–3047 (Bankr.S.D.Ohio), seeking injunctive relief to prevent Thomasville from terminating its supply contract. (R. 1, 2) Elder–Beerman later modified the proceeding to include claims for breach of contract and money damages. A hearing on the request for injunctive relief was held on April 19, 1996. In its decisions, dated May 3, 1996, the Bankruptcy Court, found that Thomasville had violated the automatic stay, *Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc.,* 195 B.R. 1019 (Bankr.S.D.Ohio 1996), and denied Thomasville's motion to annul the stay, *In re Elder–Beerman Stores*

*Corp.,* 195 B.R. 1012 (S.D.Ohio 1996).[1] Stating that Thomasville's attempt to terminate the contract should be treated as *void ab initio,* Elder–Beerman's request for an injunction was denied as moot. 195 B.R. at 1025. As for damages for the violation of the automatic stay, the Bankruptcy Court concluded, on June 19, 1996, that a corporate debtor, such as Elder–Beerman, was not entitled to damages. *Elder–Beerman Stores Corp. v. Thomasville Furniture Indus., Inc.,* 197 B.R. 629 (Bankr.S.D.Ohio 1996). However, the court concluded that it may award civil contempt damages to Elder–Beerman under its statutory contempt power, pursuant to 28 U.S.C. § 1481 and 11 U.S.C. § 105(a). Because the issue of the amount of damages caused by the violation of the automatic stay had not been litigated during the April 19, 1996, hearing, the Bankruptcy Court reserved that issue for a subsequent hearing.

Following the April, 1996, hearing, the parties proceeded with discovery, and a trial date was set on the issues of breach of contract, violation of the automatic stay, causation and damages. Prior to trial, Judge Clark ordered a settlement conference between the parties with Bankruptcy Judge Burton Perlman. As a result of that conference, Elder–Beerman and Thomasville entered into an Agreed Order (R. at 62), which was signed by Judges Perlman and Clark and entered on September 26, 1996. Under the Agreed Order, it was assumed, for the purposes of the Adversary Proceeding only and without constituting an admission by Thomasville, that Thomasville had breached its contract with Elder–Beerman by failing to provide discounts, promotional incentives and sales support, and by stopping shipments of furniture until Thomasville received $300,000 from Elder–Beerman to secure post-Petition credit sales ("Assumed Breaches"). To recover damages for the Assumed Breaches, Elder–Beerman had to prove causation and damages. Potential damages were limited to the amount, if any, caused by Thomasville's violation of the automatic stay and for the time period between October 17, 1995, and July 31, 1996 ("Damages Period").[2] Furthermore, damages were limited to lost profits from the loss of Thomasville furniture sales, non-Thomasville furniture sales, ancillary sales, and credit card carrying charges. Elder–Beerman released and waived all other claims against Thomasville.[3]

On October 24 and 25, 1996, the Bankruptcy Court held a hearing on the issue of causation and damages. At that trial, Elder–Beerman asserted a claim for lost profits damages in the amount of $650,005.00.[4] On February 12, 1997, the trial court entered judgment against Thomasville and

1. Thomasville resumed its relationship with Elder–Beerman following the April 19, 1996, hearing.

2. October 17, 1995, represents the date that Elder–Beerman filed its Bankruptcy Petition. Although the parties agreed that Elder–Beerman could seek damages for the time period between October 17, 1995, and July 31, 1996, the parties focused on mid-October, 1995, through mid-April, 1996, when Thomasville and Elder–Beerman resumed their relationship. That period of time corresponded, roughly, with the fourth quarter of 1995 (November through January) and first quarter of 1996 (February through April) of Elder–Beerman's fiscal year. Accordingly, Elder–Beerman presented its sales data and calculations in terms of its fiscal year.

3. In addition to narrowing the issues for trial to causation and damages, the Agreed Order also: 1) established a trial date for the unresolved issues; 2) established a method for determining the award of attorneys' fees, if any, for Elder–Beerman; 3) set the procedure for the termination of the contract between the parties; and 4) set a termination date for the contract. (R. at 62)

4. Under the Agreed Order, Elder–Beerman was to state, at the commencement of the hearing on causation and damages, a total amount of damages sought. Attorneys' fees, which were capped at $250,000 in the Order, would be calculated by multiplying $250,000 by the percentage of the damages sought that were actually awarded by the trial court. (R. at 62)

awarded Elder–Beerman a sum of $593,164.57 in civil contempt damages, representing $428,414.57 in lost profits and $164,750.00 in attorneys' fees, plus interest.[5]

On April 18, 1997, Thomasville filed a notice of appeal with this Court.[6] Its brief in support of its appeal was filed with this Court on June 9, 1997. Elder–Beerman responded to Thomasville's brief on July 15, 1997. Thomasville replied, by means of a reply memorandum, on August 12, 1997.

## II. *Issues on Appeal*

In its Statement of Issues on Appeal, filed March 6, 1997, with the Bankruptcy Court,[7] Thomasville enumerated thirty-six separate alleged errors by the Bankruptcy Court during the October, 1996, hearing. In its memorandum in support of its appeal, Thomasville consolidated and summarized these errors as follows:

(1) Did the [T]rial [C]ourt err in concluding that Elder–Beerman carried its burden of proving lost profit from lost sales of Thomasville furniture with reasonabl[e] certainty, such that the damages were not remote or speculative, as required by Ohio law?

(2) Did the Trial Court err in concluding that Elder–Beerman carried its burden of proving with reasonable certainty that the Assumed Breaches, as defined in the Agreed Order, were the actual proximate cause of Elder–Beerman's purported lost sales of Thomasville Furniture and lost profits thereon, as required by Ohio Law?

(3) Did the Trial Court err in failing to consider evidence of facts and circumstances, other than the Assumed Breaches, that could have caused a decline in Elder–Beerman's sales and profits?

(4) Did the Trial Court err, when it calculated Elder–Beerman's purported lost profits, by ignoring evidence in the record of incremental costs that Elder–Beerman would have incurred if it had realized the sales that it purportedly lost?

(5) Did the Trial Court err in concluding that Elder–Beerman adequately mitigated its damages, as required by Ohio law, despite the fact that it suspended all advertising of Thomasville furniture during the relevant Damages Period defined by the Agreed Order?

(6) Did the Trial Court err in speculating that Elder–Beerman's sales of Thomasville furniture would have accelerated after Elder–Beerman filed its bankruptcy petition, thus substantially overstating Elder–Beerman's purported lost sales and lost profits?

(7) Did the Trial Court err in understating its own calculation of the effect that Elder–Beerman's bankruptcy filing had on Elder–Beerman's sales of Thomasville furniture?

(8) Did the Trial Court err in concluding that the decline in Elder–Beerman's sales of Thomasville furniture actually and proximately caused a decline in Elder–Beerman's sales of non-Thomasville furniture?

(9) Did the Trial Court err in awarding Elder–Beerman damages for lost income from all Elder–Beerman retail credit facilities, when both parties had consensually agreed that Elder–Beerman's damages for lost credit

---

5. The amount of damages awarded by the Bankruptcy Court equaled approximately 65.9% of the amount sought by Elder–Beerman. Accordingly, attorneys' fees were calculated by multiplying $250,000 by 65.9%, equaling $164,750.

6. Elder–Beerman also filed a notice of appeal. That appeal was subsequently withdrawn.

7. Although filed with the Bankruptcy Court, the statement of issues on appeal does not appear to have been either included in the record on appeal or filed with this Court.

income would be limited to "credit card carrying charges"?

(10) Did the Trial Court err in concluding that Elder–Beerman carried its burden of proving that (I) profits from non-Thomasville furniture and (ii) profits from credit card carrying charges were within the contemplation of the parties at the time they made their contract, as required by Ohio law?

(11) Did the Trial Court err in calculating the amount of attorneys' fees to which Elder–Beerman is entitled under the terms of the Agreed Order?

As noted by Elder–Beerman in its Brief, Thomasville's arguments are not organized in accordance with either their eleven summaries of the assignments of error or their summary of the argument. Furthermore, Thomasville's Argument Section of its Brief merges a number of issues under individual subheadings and repeatedly raises certain issues. This inconsistency in organization has complicated this Court's efforts to systematically address Thomasville's arguments. Accordingly, in resolving this appeal, this Court has attempted to extract the arguments presented in Thomasville's brief and address them in the order presented in the Brief. Where it appeared to the Court that it was more appropriate for it to address an issue at a later point in this Decision, the Court has so noted and done so. In addition, where the Court could easily associate the argument with one of the eleven assignments of error, the Court has referred to the relevant assignment of error. Finally, to the extent that discrepancies existed in the Summary of the Issues on Appeal, the Summary of the Argument, and the Argument Section of its brief as to the characterization of an issue, this Court has addressed Thomasville's contentions as presented in the Argument Section. *See Priddy v. Edelman*, 883 F.2d 438, 446 (6th Cir.1989)("We normally decline to consider issues not raised in the appellant's opening brief."); 20 James Wm. Moor et al., *Moore's Federal Practice* ¶ 328.20[7] (3d ed.1998)(any issues not briefed by the parties on appeal are considered waived).

III. *Standards of Review*

■ A trial court's decision to impose sanctions for contemptuous conduct is reviewed for abuse of discretion. *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 721 (6th Cir.1996). Where the Bankruptcy Court acts as the trial court, the Bankruptcy Court makes initial findings of fact and conclusions of law. The District Court, acting as an appellate court, then reviews the Bankruptcy Court's findings of fact for clear error and the bankruptcy court's conclusions of law *de novo*, *Wesbanco Bank Barnesville v. Rafoth (In re Baker & Getty Fin. Servs., Inc.)*, 106 F.3d 1255, 1259 (6th Cir.) (citing Bankr.R. 8013), *cert. denied*, 522 U.S. 816, 118 S.Ct. 65, 139 L.Ed.2d 27 (1997). "A factual finding will only be clearly erroneous when, although there is evidence to support it, 'the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *United States v. Ayen*, 997 F.2d 1150, 1152 (6th Cir.1993) (citations omitted). The Bankruptcy Court's findings of fact will not be disturbed unless there is the "most cogent evidence of mistake of justice." *In re Edward M. Johnson and Assocs., Inc.*, 845 F.2d 1395, 1401 (6th Cir.1988)(quoting *Slodov v. United States*, 552 F.2d 159, 162 (6th Cir.1977), *rev'd on other grounds*, 436 U.S. 238, 98 S.Ct. 1778, 56 L.Ed.2d 251 (1978)). Where a Bankruptcy Court's determination involves a mixed question of law and fact, the District Court must "break it down into its constituent parts and apply the appropriate standard of review for each part." *Wesbanco*, 106 F.3d at 1259 (citing *Investors Credit Corp. v. Batie (In re Batie)*, 995 F.2d 85, 88 (6th Cir.1993)).

## IV. *Analysis*

The present case involves proof of damages for the purpose of imposing compensatory civil contempt damages. A court may impose a fine, payable to the aggrieved party, as compensation for damages caused by the contemnor's actions. *United States v. United Mine Workers of America*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Braun v. Champion Credit Union*, 152 B.R. 466, 474 (N.D.Ohio 1993). The amount of the fine must be based upon evidence of the actual loss suffered by the aggrieved party. *Id.;* *Ross v. Meyers*, 883 F.2d 486, 491 (6th Cir.1989); *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 646 F.2d 800 (2d Cir.1981). In determining the amount of damages caused by Thomasville's actions, the Bankruptcy Court applied the law of Ohio with respect to lost profit damages. Neither party disputes the Bankruptcy Court's use of that standard. Rather, the heart of this appeal is whether the Bankruptcy Court erred in determining that Elder–Beerman satisfied its burden under Ohio law of proving both that Thomasville caused lost profits and the amount of those losses.

Under Ohio law, to assert a claim for lost profits, the plaintiff must demonstrate: 1) that the profits were within the contemplation of the parties at the time of execution of the contract; 2) that the loss of profits is the reasonable result of the breach; and 3) that the profits are not remote and speculative. *Charles R. Combs Trucking, Inc. v. International Harvester Co.*, 12 Ohio St.3d 241, 466 N.E.2d 883, 885 (1984). To recover lost profits in a breach of contract action, the amounts of lost profits, as well as their existence, must be demonstrated with reasonable certainty. *Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St.3d 65, 521 N.E.2d 814 (1988). Evidence of lost prof-

its must be reasonable, but do not need to be specific. *Combs*, 466 N.E.2d at 887. In their Agreed Order, the parties stipulated that Elder–Beerman was required to prove causation and damages, the second and third parts of the *Combs* test.[8]

The Court now turns to Thomasville's assignments of error regarding the Bankruptcy Court's calculation and award of lost profits damages to Elder–Beerman as civil contempt damages.

### A. *Bankruptcy Court's Calculation was Speculative*

As its initial argument, Thomasville broadly asserts that the Bankruptcy Court's calculation of damages was speculative and contrary to Ohio law. Thomasville sets forth a number of different arguments, including: 1) the bankruptcy effect, as calculated by the Bankruptcy Court, is understated; 2) the Bankruptcy Court's averaging method of calculating the growth in sales during the Damages Period is speculative; 3) the Bankruptcy Court failed to consider other intervening factors that were responsible for Elder–Beerman's lost sales of Thomasville furniture; and 4) the Bankruptcy Court erred as a matter of law by substituting its own projections for that of Elder–Beerman's expert. Thomasville asserts each of these subarguments, under their own subheadings, at subsequent points in its Brief. In general, the supporting arguments are more thoroughly communicated at that point. Accordingly, each of these arguments will be addressed, *infra.*

### B. *Intervening Causes Affecting Proximate Cause*

Thomasville asserts that the Bankruptcy Court erred in failing to consider other facts and circumstances that may have caused the decline in Elder–Beerman's

---

**8.** Thomasville asserts that its agreement to the Agreed Order did not constitute a waiver its right to insist that Elder–Beerman prove that damages were in the contemplation of the parties. As discussed, *infra,* this Court con-

cludes that the Agreed Order unambiguously provides that Elder–Beerman must prove only the second and third prongs of the *Combs* test.

furniture sales during the Damages Period. Thomasville focuses on three potential intervening causes: 1) Elder–Beerman's failure to advertise, 2) the entrance of Morris Brothers Furniture into the Dayton furniture market, and 3) the harsh winter weather. Thomasville's assignment of error claims that the Bankruptcy Court failed to consider evidence of these intervening causes, constituting an error in the application of Ohio law.[9]

The Bankruptcy Court's opinion mentions and addresses the potential intervening factors raised by Thomasville's expert. Specifically, the Bankruptcy Court noted that Thomasville "stressed several intervening factors which might have affected sales of Thomasville products at Elder–Beerman, including Elder–Beerman's discontinuation of advertising through the breach period, economic and demographic factors, weather, store and product specific policies, and the impact of several furniture-related bankruptcies and store closings in the Cincinnati area." 206 B.R. at 160. The Bankruptcy Court later states: "Other factors raised by Thomasville's expert witness[,] Steven Pierce[,] include general factors such as weather and changes in Elder–Beerman policies, which would have affected all Elder–Beerman sales, and more specific factors such as bankruptcies within the furniture industry and competition within the local furniture market." *Id.* The Bankruptcy Court then briefly addressed each of these concerns. Furthermore, the Bankruptcy Court did not state that specific evidence was irrelevant and would not be considered. Accordingly, it is clear that the Bankruptcy Court did not fail to consider evidence of these other facts and circumstances that may have caused the decline in Elder–Beerman's furniture sales. In fact, Thomasville's argument, in essence, disputes the

Bankruptcy Court's handling of those issues. Thus, Thomasville's assignment of error is more appropriately addressed as one claiming that the Bankruptcy Court's factual conclusions regarding the intervening causes are clearly erroneous.

As stated above, Thomasville challenges the Bankruptcy Court's conclusions regarding Elder–Beerman's failure to advertise, the effect of weather, and the effect of competition from Morris Brothers Furniture. Each of these will be addressed in turn.

### 1. *Advertising*

■■■ Thomasville claims that the Bankruptcy Court's conclusion that Elder–Beerman's failure to advertise was not an independent intervening cause of Elder–Beerman's losses is clearly erroneous. The Bankruptcy Court determined that Elder–Beerman's decision to cease advertising was not voluntary but, rather, was "the sound business judgment of a retailer that had discovered it could not count on support from its supplier." 206 B.R. at 156. The Bankruptcy Court's determination that Elder–Beerman stopped advertising as a consequence of the breaches is a factual determination which this Court will reverse only for clear error. Upon review of the record, the Bankruptcy Court's determination is not clearly erroneous.

Thomasville raises the argument that the promotional incentives lost were valued at only $50,000, while lost profits suffered by Elder–Beerman by its failure to advertise amounted to $650,000. Thomasville further points out that it never canceled an order nor ceased to accept orders from Elder–Beerman, and it continued to provide promotional discounts on upholstery and new product lines. Thomasville, thus, disputes the Bankruptcy Court's con-

9. Elder–Beerman's Brief also states that "[w]hether the Bankruptcy Court considered the evidence before it is a legal issue to be reviewed de novo by this court." (Elder–Beerman Brief at 22.) However, as discussed, *infra,* this Court construes Thomas-

ville's argument as disputing the Bankruptcy Court's factual determinations which form the basis for its legal conclusion regarding proximate cause. Accordingly, this Court disagrees with the parties' contention that this is a legal issue subject to *de novo* review:

clusion that it was within the "sound business judgment" of Elder–Beerman to cease advertising as a result of Thomasville's actions.

■■■ Although Thomasville presented evidence supporting these facts, the Bankruptcy Court also heard evidence that Thomasville substantially altered its business relationship with Elder–Beerman, for the worse, following the filing by Elder–Beerman of its Bankruptcy Petition. In particular, the record contains evidence that Thomasville suspended shipment for three weeks following the filing of the Petition, pending the receipt of $300,000 in security. (1 Testimony of Nesbit at 29; 2 Testimony of Nesbit at 38; R. at 62) [10] Mr. Ronald Bultema, a divisional merchandise manager for Elder–Beerman, and Mr. Mike Nesbit, a marketing representative for Thomasville, both testified that, following the filing of the Bankruptcy Petition, the sales support provided by Mr. Nesbit decreased significantly (1 Testimony of Bultema at 85; 1 Testimony of Nesbit at 59), and that Thomasville notified Elder–Beerman of its intent to terminate their business relationship. (2 Testimony of Nesbit at 56)

■■■ Although no statistical evidence was provided, it was reasonable for the Bankruptcy Court to infer that the actions of Thomasville would cause Elder–Beerman to doubt Thomasville's commitment to continue to provide goods and services to it. It is also reasonable to infer that Elder–Beerman would question the wisdom of investing advertising money toward a product when the future cooperation of Thomasville was doubtful. Although Mr. Bultema was the only witness for Elder–Beerman to state that it made no sense to continue advertising, in light of Thomasville's actions, the Bankruptcy Court apparently considered his testimony to be reasonable and credible. Because it is not

the place of this Court to review the credibility of witnesses, *United States v. Gessa,* 57 F.3d 493, 496 (6th Cir.1995), *cert. denied,* 516 U.S. 1098, 116 S.Ct. 827, 133 L.Ed.2d 769 (1996)(appellate courts generally do not review the trial court's determination regarding a witness's credibility), this Court will not overrule the Bankruptcy Court's acceptance of Mr. Bultema's testimony. This Court, therefore, concludes that the Bankruptcy Court's determination that the cessation of advertising was a consequence of Thomasville's actions and not an independent, voluntary decision by Elder–Beerman is not clearly erroneous. Accordingly, the Bankruptcy Court did not err in determining that Elder–Beerman's cessation of advertising was not an intervening factor which caused Elder–Beerman to lose profits.

### 2. *Competition from Morris Brothers Furniture*

Thomasville next asserts that the Bankruptcy Court erred in its conclusion that the emergence of Morris Brothers Furniture was not an intervening factor. In addressing the furniture-specific factors that may have affected causation, the Bankruptcy Court looked at the percentage change in sales of Thomasville furniture during the Damages Period compared to the percentage change in the sale of non-Thomasville furniture during that time. Noting that Elder–Beerman's sales of Thomasville were affected in a disproportionate manner from its sales of non-Thomasville furniture, the Bankruptcy Court concluded that other bankruptcies in the furniture industry and competition within the local market did not refute Elder–Beerman's evidence that Thomasville's actions caused the decline in its Thomasville sales.

Thomasville asserts that the Bankruptcy Court's conclusion is erroneous, because

10. As noted by the parties and the Bankruptcy Court, the October, 1996, hearing occurred over two days, resulting in two separately paginated transcripts. Accordingly, as did

the Bankruptcy Court, this Court will also designate "1" for the October 24, 1996, transcript and "2" for that of October 25, 1996.

there was clear evidence in the record that Morris Brothers Furniture entered the Dayton market as a competing seller of Thomasville furniture in 1995. Thomasville also points to testimony by Mr. Bultema that Elder–Beerman was forced to compete with Morris Brothers for Thomasville sales in the marketplace.

■ Despite Thomasville's citation to the record, the Bankruptcy Court's determination is not clearly erroneous. Elder–Beerman provided statistical evidence that its sales of Thomasville furniture dropped during the Damages Period, yet showed an increase in growth after the resumption of the relationship between Elder–Beerman and Thomasville in April, 1996. Because the evidence indicated that Morris Brothers Furniture provided competition for Elder–Beerman in the Dayton area during the period when sales rebounded (*see* 1 Testimony of Nesbit at 45–46), the Bankruptcy Court could reasonably infer that the increased competition by Morris Brothers Furniture was not an intervening cause of the drop in sales during the Damages Period.

In addition, the Bankruptcy Court could reasonably infer from the evidence presented that Morris Brothers Furniture would not have provided increased competition absent the Assumed Breaches. Mr. Nesbit testified that Thomasville began to focus its energies on developing a relationship with Morris Brothers Furniture after the filing of the Bankruptcy Petition in October, 1995, (1 Testimony of Nesbit at 29, 45) Mr. Nesbit further acknowledged that his calendar of appointments indicated increased meetings with Morris Brothers beginning in January, 1996, (*id.* at 33–34), which was the time that Thomasville notified Elder–Beerman that it would be terminating their relationship. Although Thomasville's development of a relationship with Morris Brothers Furniture was not a violation of the automatic stay, the

Bankruptcy Court could reasonably conclude, from the evidence, that Thomasville would not have developed that relationship had Elder–Beerman not filed its Bankruptcy Petition and had Thomasville continued to provide discounts, promotional incentives and sales support to Elder–Beerman. Accordingly, although the Bankruptcy Court could have found that the competition from Morris Brothers Furniture caused a decreased in Elder–Beerman's sales of Thomasville products, the court's conclusion to the contrary is not clearly erroneous.

### 3. *Winter Weather*

■ Finally, Thomasville asserts that the Bankruptcy Court erred in not accounting for the effect of harsh winter weather on the sales of Thomasville products. In addressing "general factors", which included the effect of the weather on Thomasville sales, the Bankruptcy Court noted that the bankruptcy effect [11] proffered by Mr. Julian Taub, Elder–Beerman's expert, was actually an analysis of all post-Petition factors affecting Elder–Beerman sales. 206 B.R. at 160. The court, therefore, considered the bankruptcy effect variable to include, or "factor out", such general factors as the harsh weather.

Thomasville argues that the Bankruptcy Court's treatment of these factors is clearly erroneous, because the court concluded that the bankruptcy effect had terminated in January, 1996. The Bankruptcy Court, therefore, failed to account for the effects of the harsh winter weather in the first quarter of 1996. Thomasville's argument has merit.

■ The Bankruptcy Court's opinion acknowledges that the harsh winter weather during the winter of 1995–1996 was a potential intervening factor which should be addressed. By including the general

---

11. Both Elder–Beerman and Thomasville agreed that, as a result of filing of a Bankruptcy Petition, the debtor would suffer a short-term dip in sales. The parties referred to this short-term dip as the "bankruptcy effect."

factors in the bankruptcy effect, the Bankruptcy Court stated, without making specific findings as to the effect of the weather, that the general factors were accounted for during the period when the bankruptcy effect existed, *i.e.*, November and December of 1995. The Bankruptcy Court, however, failed to make clear findings of fact as to whether the winter weather impacted sales in the first quarter of 1996 and, if so, how that impact is taken into account by its calculation.

This Court notes that there is conflicting testimony regarding the effect of the weather on furniture sales. Mr. Nesbit testified that sales during the first quarter of 1996 were down 40%, a drop which he attributed to the harsh winter weather. (2 Testimony of Nesbit at 44–45) However, Mr. Bultema testified that he did not believe that the weather impacted sales. (1 Testimony of Bultema at 86) Furthermore, the fact that Thomasville sales were affected disproportionately from non-Thomasville furniture sales may suggest that a general factor, such as the weather, was not an intervening cause of the drop in sales during the Damages Period. It is not the role of this Court, however, to make a factual determination as to whether the winter weather was an intervening cause of the drop in sales of Thomasville products during the first quarter of 1996, when the bankruptcy effect was not applied. This Court must, therefore, remand to the Bankruptcy Court for a determination of this issue and for any necessary modifications to the calculation of damages.

**12.** This issue on appeal is again couched a number of ways. The Summary of the Issues on Appeal states that the Bankruptcy Court erred by ignoring evidence in the record. The Summary of the Argument also asserts that the Bankruptcy Court ignored clear and credible evidence. Both of these characterizations appear to raise an argument that the Bankruptcy Court erred as a matter of law. Thomasville's actual argument in its brief, however, asserts that the calculation of net profits was clearly erroneous, because it failed to account for certain incremental ex-

## C. *Calculation of Net Profits*

Thomasville asserts that the Bankruptcy Court's calculation of net profits is clearly erroneous, because it disregards two expenses that Elder–Beerman would have incurred had the Assumed Breaches not occurred.[12] Specifically, Thomasville claims that Elder–Beerman would have incurred additional advertising expenses and sales commissions.

 Under Ohio law, a plaintiff seeking lost profits must prove not only gross profits, but also the expenses and costs associated with obtaining those profits. *E.g.*, *Digital & Analog Design Corp. v. North Supply Co.*, 44 Ohio St.3d 36, 540 N.E.2d 1358 (1989); *Kinetico, Inc. v. Independent Ohio Nail Co.*, 19 Ohio App.3d 26, 30–31, 482 N.E.2d 1345, 1350 (Cuyahoga Cty.1984). Where no expenses were saved as a result of the breach of contract or where there would have been no additional costs to generate the profits that were lost, the plaintiff need only assert and prove such circumstances. *Digital & Analog Design Corp.*, 540 N.E.2d at 1362–63.

The Bankruptcy Court's decision addresses both advertising and commission expenses. With regard to advertising expenses, the Bankruptcy Court found that no advertising expenses were saved as a result of the breach. It stated that, although the advertising dollars were shifted to other merchandise, advertising was spent at the same rate during the Damages Period. (206 B.R. at 168, citing 1 Testimony of Bultema at 103) As to the issue of commission expenses, the court

penses. This characterization suggests that the Bankruptcy Court's factual conclusion that Elder–Beerman would not have incurred additional advertising and commission expenses was clearly erroneous. Although Elder–Beerman addresses this issue as a legal question, reviewed *de novo*, this Court concludes, based on Thomasville's arguments (Thomasville Brief at 24–28), that Thomasville contends that the Bankruptcy Court's factual findings were clearly erroneous. The Court will therefore apply the clearly erroneous standard of review.

found that no incremental sales commission expenses were saved during the Damages Period. Again citing to the testimony of Mr. Bultema, the Bankruptcy Court accepted the testimony that salespersons were paid a draw on their commission based on their previous year's sales. The court, therefore, found that a change in the volume of sales would neither increase nor decrease the costs to Elder–Beerman. 206 B.R. at 167. Thomasville asserts that the Bankruptcy Court's decision is clearly erroneous, because it mischaracterizes the testimony provided by Elder–Beerman on both issues.

With regard to advertising expenses, Thomasville points to the testimony of its expert, Steven Pierce, who stated that Elder–Beerman would have had to expend additional advertising money in order to generate the additional incremental sales of Thomasville furniture. Accordingly, Thomasville claims that Mr. Pierce's testimony rebuts the Bankruptcy Court's conclusion that Elder–Beerman would not have incurred any incremental advertising expenses associated with generating additional Thomasville furniture sales.

■ The Bankruptcy Court's findings with regard to advertising expenses are not clearly erroneous. Mr. Bultema testified that Elder–Beerman continued to advertise at the same frequency and with the same number of pages as prior to the Damages Period. (1 Testimony of Bultema at 103) He further testified that Elder–Beerman continued to advertise at the same level but had shifted those funds to different products. (*Id.* at 120) Based on this testimony, the Bankruptcy Court

could reasonably infer that Elder–Beerman's advertising expenses were a fixed expense, and that Elder–Beerman would not have spent additional funds to produce the incremental sales increase during the Damages Period. Accordingly, the Bankruptcy Court's determination that Elder–Beerman did not save advertising expenses was not clearly erroneous.

As to the commissions, Thomasville asserts that the Bankruptcy Court's conclusion is clearly erroneous, because the evidence presented by Elder–Beerman did not address the amount of commissions that would have been paid to sales associates had the increased Thomasville sales occurred. Thomasville states that Elder–Beerman's evidence proved only that Elder–Beerman placed a "floor," not a "ceiling," on the amount of commissions that their salespeople would earn. Because Elder–Beerman claims that it would have made more sales during the Damages Period than it had during the same fiscal quarters of the previous year, Thomasville argues that Elder–Beerman saved the amount of commissions that it would have paid its salespeople for the additional sales.[13]

■ Thomasville's assignment of error, with respect to commissions, is sustained. As with the issue of advertising expenses, Elder–Beerman's evidence regarding commission expenses was presented by Mr. Bultema. Mr. Bultema testified that sales associates are paid on a commission versus draw basis. (1 Testimony of Bultema at 101) The draw amount is based upon prior year's selling.[14] Under this system, an

---

13. Taking the fourth quarter of 1995 as an example, Elder–Beerman's testimony supports findings that the commission draw for that quarter was based on sales of $468,500, the sales amount for fourth quarter of 1994. Mr. Bultema's testimony also supports a finding that Elder–Beerman paid its sales associates draws for $468,500 of sales, even though Elder–Beerman sold only $378,900 in fourth quarter of 1995. However, Thomasville asserts that Elder–Beerman would have had to pay commissions on the additional amount,

above $468,500, that Elder–Beerman would have sold in the fourth quarter of 1995 had the Assumed Breaches not occurred.

14. Although Mr. Bultema stated that the draw amount is "based on" prior year's selling, "based on" does not necessary imply that the draw amount equals the amount that the sales associate sold during the prior year. It merely implies that the formula that is used to calculate the current draw amount is based on data from the prior year.

associate is given a weekly dollar amount. The associate is required to sell a specific amount of product, and based upon the commission rate of the product (six or eight percent), the employee would "cover" their draw. Mr. Bultema testified that, during the Damages Period, a number of employees did not meet their goals but were paid their draw.

Mr. Bultema's testimony clearly supports the Bankruptcy Court's conclusion that Elder–Beerman did not pay less in commissions than it did in the previous year. However, unlike the advertising expenses, Mr. Bultema's testimony does not clearly support an inference that Elder–Beerman's commission expenses are relatively fixed. However, the Bankruptcy Court made no specific finding regarding whether Elder–Beerman would have had to pay additional commission expenses, above the draw amount, for the Thomasville furniture that it would have sold during the Damages Period, in excess of the amount sold during the previous year.[15] Therefore, this Court must remand to the Bankruptcy Court for a determination of whether Elder–Beerman saved commission expenses for the projected sales above the amount sold in the previous year.

### D. *Mitigation of Damages*

In its Fifth Assignment of Error, Thomasville asserts that the Bankruptcy Court erred in failing to require Elder–Beerman to mitigate damages.[16] The crux of Thomasville's argument can be broken into two subparts. *First,* the Bankruptcy Court's

finding that Elder–Beerman's cessation of advertising was caused by the Assumed Breaches was clearly erroneous. *Second,* because Elder–Beerman's failure to advertise Thomasville furniture was voluntary, Elder–Beerman failed to mitigate damages, and the Bankruptcy Court should not have allowed Elder–Beerman to recover under Ohio law.

■ In a breach of contract action under Ohio law, a plaintiff has a duty to mitigate damages. If the plaintiff fails to mitigate such damages, the defendant cannot be charged with them. This duty applies to those damages which the plaintiff could have avoided with reasonable effort and without undue risk or expense. *Chandler v. General Motors Acceptance Corp.,* 68 Ohio App.2d 30, 426 N.E.2d 521 (Hamilton Cty.1980); *Provident Bank v. Barnhart,* 3 Ohio App.3d 316, 445 N.E.2d 746 (Hamilton Cty.1982). The duty to mitigate damages, also called the doctrine of avoidable consequences, "requires only reasonable, practical care and diligence, not extraordinary measures to avoid excessive damages." *Provident,* 445 N.E.2d at 750.

The plaintiff's right is to recover such damages as the defendant's wrong necessarily caused him. It is usually said that the plaintiff is under a duty to mitigate damages. However, the truth seems rather to be that damages which the plaintiff might have avoided with reasonable effort without undue risk, expense, or humiliation are either not caused by the defendant's wrong or

---

**15.** Elder–Beerman seems to support Thomasville's argument by noting in its Brief that "at some level of sales significantly above what Elder–Beerman experienced during the damages period some of its sales associates would have begun receiving commissions over and above their draws." (Elder–Beerman Brief, n. 8)

**16.** In its Summary of Issues on Appeal, Thomasville couches this issue as whether the Bankruptcy Court erred in concluding that Elder–Beerman adequately mitigated its damages, which appears to question whether the Bankruptcy Court's factual findings regarding

mitigation were clearly erroneous. The Summary of the Argument states that the "Trial Court failed to consider whether Elder–Beerman had adequately mitigated damages by [not] advertising Thomasville products and making efforts to increase sales of Thomasville products during the Damages Period." The Summary of the Argument, therefore, appears to question whether the Bankruptcy Court applied Ohio law incorrectly by failing to require mitigation of damages. Although not clearly stated in the Argument section, this Court interprets Thomasville's brief as trying to raise both issues.

need not have been, and, therefore, are not to be charged against him.

*Chandler*, 426 N.E.2d at 522 (quoting 11 Williston on Contracts § 1353 (3d ed.1968)). Although the plaintiff bears the burden of mitigation, the breaching party bears the burden of establishing by reasonable certainty that the plaintiff failed to mitigate its damages. *State ex rel. Martin v. Columbus Dept. of Health*, 58 Ohio St.2d 261, 265, 389 N.E.2d 1123, 1125 (1979).

 Central to Thomasville's mitigation argument, as well as its causation and intervening factors arguments, is the assertion that Elder–Beerman's cessation of advertising was a voluntary decision by Elder–Beerman and not a product of the Assumed Breaches. Thomasville asserts that Elder–Beerman could have mitigated its loses had it continued to advertise Thomasville furniture. As discussed, *supra*, this Court concludes that the Bankruptcy Court's determination that Elder–Beerman's cessation of advertising was a product of Thomasville's Assumed Breaches is not clearly erroneous. Elder–Beerman cannot be charged with failing to mitigate when Elder–Beerman's actions were the result of the breach itself. Thus, for Thomasville to sustain its contention that Elder–Beerman failed to mitigate its damages, Thomasville was required to assert and to prove that Elder–Beerman could have mitigated its losses through other actions. This Court finds no evidence that Thomasville asserted during the October, 1996, hearing that additional acts, or failures to act, by Elder–Beerman constituted failures to mitigate. Furthermore, Thomasville has not raised any such argument with this Court. Accordingly, this Court concludes that the Bankruptcy Court did not err in its application of Ohio's doctrine of avoidable consequences as to Elder–Beerman.

**E. Court's Projected Acceleration of Sales**

Thomasville's Sixth Assignment of Error in its Issues on Appeal focuses on the Bankruptcy Court's independent calculation of the projected sales of Thomasville furniture that Elder–Beerman would have made had the Assumed Breaches not occurred.[17] Thomasville asserts: 1) that because the Bankruptcy Court rejected Elder–Beerman's calculation of the rising trend in sales, Elder–Beerman failed to meet its burden of proving that sales would have continued to rise during the Damages Period, 2) that the Bankruptcy Court erred, as a matter of law, by independently calculating an average growth rate of 68.5%, and 3) that the Bankruptcy Court's factual determination that the growth rate would have been 68.5% is clearly erroneous. (Thomasville Brief at 32–33)

**1. Elder–Beerman's Evidence of Accelerated Growth**

Thomasville's initial argument is that Elder–Beerman failed to establish with reasonable certainty that there was a trend, whereby Elder–Beerman's sales of Thomasville furniture would have accelerated during the Damages Period. In so arguing, Thomasville focuses on Elder–Beerman's proof of the trend, provided by Julian Taub, and the Bankruptcy Court's findings with regard to the credibility of Mr. Taub's testimony.

To prove the amount of sales of Thomasville products that it would have made had the Assumed Breaches not occurred, Elder–Beerman offered the testimony of Julian Taub. Mr. Taub's conclusion was grounded on two basic assumptions: 1) that sales during the Damages Period could be predicted by analyzing the trend of known periods of time outside the Damages Period; and 2) that the difference

17. Thomasville contests neither the Bankruptcy Court's factual determinations as to the actual sales of Thomasville products for the first quarter of 1994 through the second quarter of 1996 (Table 3), nor that court's determination of the percentage change in sales for that period (Table 4).

between the projected sales and actual sales indicates the lost sales due to Thomasville's actions and other factors common to all Elder–Beerman sales. (1 Testimony of Taub 169, 171–72; 206 B.R. at 163) The lost sales due to Thomasville's actions would then be calculated by subtracting out the losses due to factors common to all Elder–Beerman sales. *Id.* The Bankruptcy Court expressly accepted these assumptions and proceeded to use this methodology. 206 B.R. at 163.

To calculate the projected sales, Mr. Taub assumed that sales have momentum. As summarized by the Bankruptcy Court:

[Mr. Taub] assumed that sales would follow the trend witnessed in the first three quarters of 1995. Sales of Thomasville goods in the first quarter of 1995 rose by 49.1% of sales in the same quarter in 1994. The second quarter of 1995 realized an even greater gain over the corresponding quarter in 1994, 58.6%. The third fiscal quarter realized the greatest gain of all, 112.6%.

Mr. Taub observed that Thomasville sales for these quarters were rising, and from that observation, he predicted that but for the bankruptcy and Thomasville's actions, sales would have continued this trend into the fourth fiscal quarter. Using the highly problematic "trend" analysis, Mr. Taub predicted that sales for the fourth fiscal quarter of 1995 would have risen 145% over the same quarter in 1994, had there been neither a bankruptcy petition nor the actions to terminate the Elder–Beerman/Thomasville relationship taken by the Defendants. For the first fiscal quarter of 1996, Mr. Taub abandoned his trend analysis and simply predicted that sales for this quarter would have risen at the same rate as sales in the second quarter of 1996.

206 B.R. at 165.

In analyzing Elder–Beerman's expert, the Bankruptcy Court found certain aspects of Mr. Taub's testimony to be unreliable and arbitrary. The Bankruptcy Court stated:

In examining the predictions by Mr. Taub, the court cannot help but be struck by the apparent randomness of the (sic) Mr. Taub's methods in reaching the given percentages. As to the first prediction, Mr. Taub simply assumed that sales would continue in their upward trend indefinitely, and made little or no attempt to relate his prediction to the factors underlying the dramatic increases in fiscal quarter one through three of 1995. . . .

Unlike the fourth quarter prediction, which is based upon questionable statistics, the first quarter prediction is simply arbitrary. Based upon questionable conclusions regarding the resumption of promotional activities, Mr. Taub makes the assumption that first quarter sales would be equal to the known second quarter sales. In doing so, Mr. Taub fails to address why sales he had predicted would continue to rise through the fourth quarter would suddenly drop to nearly a third of the previously predicted growth rate. The court finds Mr. Taub's calculation of the first quarter predicted sales even more questionable than the previously rejected fourth quarter prediction, and it is likewise rejected.

206 B.R. at 165–66.

■■■■■ Based on the Bankruptcy Court's rejection of Elder–Beerman's proffered growth in sales, Thomasville asserts that Elder–Beerman's evidence was legally insufficient to establish the accelerated growth in Thomasville sales with reasonable certainty. As often cited by Thomasville in its brief, Ohio law requires Elder–Beerman to prove the amount, not just the existence of damages, to a reasonable certainty. *City of Gahanna v. Eastgate Properties, Inc.*, 36 Ohio St.3d 65, 521 N.E.2d 814, 817 (1988). Substantial certainty requires "more than a conclusory statement as to the amount of lost profits." *Rhodes v. Rhodes Indus., Inc.*, 71 Ohio

App.3d 797, 809, 595 N.E.2d 441, 448 (Cuyahoga Cty.1991).

More is required of the plaintiff than merely his assertion (either directly or through an expert witness) that he would have made a particular amount of profits. Unless the figure is substantiated by calculations based on facts available or in evidence, the courts will properly reject it as speculative and uncertain.

*Endersby v. Schneppe,* 73 Ohio App.3d 212, 596 N.E.2d 1081, 1084 (Allen Cty. 1991). Lost profits damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, or other similar evidence. *AGF v. Great Lakes Heat Treating Co.,* 51 Ohio St.3d 177, 555 N.E.2d 634, 640 (1990)(quoting Restatement of Contracts 2d, Section 352, Comment b). A plaintiff's claim for lost profits will, therefore, be legally sufficient if the plaintiff places facts into evidence such that the finder of fact has an adequate factual basis upon which to calculate an award of such profits, *see Silver Cloud, Inc. v. Quikut Div. of Scott Fetzer Co.,* No. 92–4373, 1994 WL 46429 (6th Cir. Aug. 26, 1994), as well as a means by which to calculate the amount of lost profits claimed, *Doner v. Snapp,* 98 Ohio App.3d 597, 601, 649 N.E.2d 42, 44 (Miami Cty.1994).

In *Silver Cloud, Inc., supra,* the defendant argued that the plaintiff had failed to meet Ohio's reasonable certainty standard for lost profits, because the plaintiff had failed to prove adequately the cost of its performance and had relied on a faulty formula. Stating that the plaintiff's president had testified as to the company's cost per unit, including materials, insurance, overhead, and depreciation, the Sixth Circuit concluded that the jury had an adequate factual basis upon which to calculate an award. As to the faulty formula, the court noted that the president had testified, contradictorily, that his initial projec-

tion was selling 300,000 units per year, and that he anticipated selling 50,000 units the first year at a profit of $1.40 per unit. The court noted that it was the role of the jury to reconcile this conflicting testimony, due to its opportunity to judge the credibility of the testimony. The Sixth Circuit, therefore, overruled the defendant's claim of error.

■ In the case at bar, Elder–Beerman's claims of lost profits, including its assertion that sales would have accelerated, are not too remote or speculative as a matter of law. Although the trial court disagreed with Elder–Beerman's expert regarding his calculations of projected sales for the fourth quarter of 1995 and the first quarter of 1996, respectively, Elder–Beerman provided substantial evidence from which the trial court could calculate the damages based on an accelerated trend. Elder–Beerman provided numerous exhibits indicating the actual sales of Thomasville products for the fiscal quarters of 1994 and 1995, prior to the Assumed Breaches, as well as for the second fiscal quarter of 1996, after Elder–Beerman and Thomasville had resumed their normal business relationship. Furthermore, Mr. Taub offered testimony indicating the percentage changes in sales of Thomasville products between fiscal quarters of 1994 and 1995, as well as the percentage change in sales between second quarter of 1995 and 1996. The evidence of the year-to-year percentage change in sales for the first through third fiscal quarters indicated a quarterly increase in the rate of growth. Such evidence was more than sufficient to form a basis from which the trial court could calculate a projected percentage change in sales for the Damages Period based on an accelerated trend.

Although the Bankruptcy Court ultimately did not accept the formulas used by Elder–Beerman's expert in arriving at the amount of lost sales caused by Thomasville

during the Damages Period,[18] the evidence provided by Mr. Taub as to his method of calculations cannot be said to be so speculative that it fails as a matter of law, such that it cannot be used as a means to determine the amount of lost sales to a reasonable certainty. Mr. Taub presented credible basic assumptions as to how to calculate the amount of lost sales attributable to Thomasville, namely that sales during the Damages Period could be predicted by analyzing the trend of known quarters outside the Damages Period and that the difference between the projected sales and actual sales indicates the lost sales due to Thomasville's actions and other factors common to all Elder–Beerman sales, from which the losses due to factors common to all Elder–Beerman sales would be subtracted. Although Mr. Taub's projected percentages of growth for the fourth fiscal quarter of 1995 and first fiscal quarter of 1996 were ultimately rejected by the Bankruptcy Court, Mr. Taub provided some rationale, including assumptions about the continuity of growth rates and the effect of opening new stores and pricing, to explain his trend projection. Although this Court, if it were charged with the task of making factual findings, would agree with the Bankruptcy Court that Mr. Taub's fourth quarter projection was overstated, this Court concludes that Elder–Beerman's evidence as to the fact that sales of Thomasville products would have continued to accelerate is not so speculative as to be warrant removal of the issue of actual damages from the trier of fact.

■■■■ In reaching this conclusion, this Court is mindful of the fact that proof of damages of lost profits often requires some conjecture. *Miami Packaging, Inc. v. Processing Systems, Inc.,* 792 F.Supp.

560, 566 (S.D.Ohio 1991)(Spiegel, J.); *Jaynes v. Vetel,* 80 N.E.2d 621, 624 (Franklin Cty.1948)("[P]rofits must in their very nature be to some extent uncertain and conjectural, so that one cannot on that account, or account of difficulties in the way of proof, be deprived of all remedy.")(quoting 13 O. Jur. at 155). "The fact that the [trier of fact] chose to assess damages in an amount substantially below that recommended by plaintiff's expert does not mean that the evidence offered in support of lost profits was inadequate as a matter of law." *Falls Steel Tube and Mfg. Co. v. Trumark, Inc.,* No. 94–3981, 1995 WL 750541 at *3 (6th Cir. Dec.18, 1995). Although Thomasville, and the Bankruptcy Court itself, identified weaknesses in the evidence of lost profits offered by Elder Beerman, including the trend analysis, Elder–Beerman's evidence, based on historical sales data, that growth would have continued was not so "speculative or remote" that the issue should not have been addressed by the trier of fact. Elder–Beerman provided sufficient evidence of the existence and the amount of damages to satisfy Ohio law and to allow the issue of damages to be so addressed and considered.

2. *The Bankruptcy Court's Independent Calculation of the Amount of Lost Profits*

■■■■ Thomasville's second argument contends that the Bankruptcy Court erred, as a matter of law, in proceeding to calculate and to apply its own independent calculation of the growth rate. (Thomasville Brief at 32.) Thomasville's argument is not sustainable. Having found, as a matter of law, that Elder–Beerman provided sufficient evidence of the existence of lost profits, the Bankruptcy Court began its

---

**18.** The Bankruptcy Court rejected Mr. Taub's selective use of data to determine the growth rates during two fiscal quarters at issue. Specifically, it rejected the use of only pre-Petition data.from 1995 to project the accelerated growth rate for the fourth quarter of 1995, and his use of data from only the second quarter of 1996 to determine the growth rate for the first quarter of 1996. However, this Court notes that the Bankruptcy Court found Mr. Taub's general methodology, *i.e.,* the use of historical data to project the growth rate during the Damages Period, to be sound and utilized the methodology in determining the amount of damages that Elder–Beerman had, in fact, shown to a reasonable certainty.

role as the trier of fact. In that capacity, the Bankruptcy Court had the ability and responsibility to evaluate the credibility of the witnesses and the other evidence presented. *Barnett v. Department of Veterans Affairs,* 153 F.3d 338 (6th Cir.1998)("Having had the benefit of a bench trial in which both sides presented witness testimony and other evidence, the fact-finding and credibility assessments of the trial court are entitled to substantial deference."); *see* Fed.R.Civ.P. 52(a). The Bankruptcy Court was in the position to evaluate and determine what facts, and ultimately what amount of damages, were reasonably certain. *Miami Packaging, Inc.,* 792 F.Supp. at 566 (the issue of whether damages are reasonably certain is generally a question of fact for the jury).

 Where a court, as trier of fact, has concerns about the damages calculations presented by the parties, the court is not bound to accept either party's version in toto. *See Cyril Bath Co. v. Winters Indus.,* 892 F.2d 465, 468 (6th Cir.1989). Rather, the court's factual findings as to the calculation of damages may vary from both party's proffers, as long as the findings are not clearly erroneous. *Id.*

In *Cyril Bath,* the plaintiff objected to the District Court's calculation of lost profits, stating that the court erroneously calculated the cost per unit of the tubes at issue. 892 F.2d at 468. In arriving at the cost per unit, the court had divided the total cost of the tubes by the number of tubes manufactured rather than by the number of units shipped, as proffered by the plaintiff. *Id.* In upholding the District Court's computation, the Sixth Circuit noted that the District Court was concerned with the calculation presented by the plaintiff's accountant, because that calculation artificially reduced the estimate of manufacturing costs. *Id.* The Sixth Circuit concluded that the District Court's calculation was not clearly erroneous, stating that its approach gave an accurate estimate of the actual cost per unit. *Id.* As with the District Court in *Cyril Bath*

regarding price per unit, the Bankruptcy Court herein made an independent calculation of the projected growth in sales during fourth quarter of 1995 and first quarter of 1996. As the finder of fact, the Bankruptcy Court's actions in doing so are not erroneous as a matter of law. Accordingly, this Court must next address whether the Bankruptcy Court's projections are clearly erroneous.

### 3. *Bankruptcy Court's Projected Growth of 68.5% is not Clearly Erroneous*

Finally, Thomasville argues that the Bankruptcy Court's determination that Elder–Beerman's sales of Thomasville products would have grown 68.5% in the fourth quarter of 1995 and first quarter of 1996 is clearly erroneous. This conclusion of the Bankruptcy Court is a factual determination, which is reviewed under the clearly erroneous standard. *See Cyril Bath Co.,* 892 F.2d at 468.

 The Bankruptcy Court's determination that the growth rate during the Damages Period would have been 68.5% was based on a review of the growth rates for the first three quarters of 1995 and the second quarter of 1996. The court concluded that the 53.8% growth rate for the second quarter of 1996, although slightly lower than the growth rate for the second quarter of 1995, refuted the testimony of Thomasville's expert, Mr. Pierce, that sales would have stayed flat. Accordingly, although the Bankruptcy Court had evidence from which it could have found that the sales for the fourth quarter of 1995 and the first quarter of 1996 would have equaled the sales for the third quarter of 1995, *i.e.,* the testimony of Mr. Pierce, it chose to find that Thomasville's projected "leveling off" of sales was not entirely credible.

The Bankruptcy Court also had evidence from which to conclude that growth in sales in the fourth quarter of 1995 would have continued to accelerate. As dis-

cussed above, the Bankruptcy Court rejected the testimony of Mr. Taub that sales would have continued to grow unchecked. It is clear from the Bankruptcy Court's decision, however, that it accepted Elder–Beerman's assertion that sales would have continued to grow during the Damages Period.

The Bankruptcy Court's determination that the growth rate was most logically calculated by averaging the rates of growth, using all the available growth rate data, appears to be an attempt to find a reasonably certain middle ground between the "leveling off" projection proffered by Thomasville and the various growth rates asserted by Elder–Beerman. Given the fact that the Bankruptcy Court was offered conflicting testimony and had the responsibility of determining which evidence to accept, this Court concludes that the Bankruptcy Court's finding was a product of its determination that evidence offered by Elder–Beerman supported a finding that a 68.5% growth rate was reasonably certain. Such a finding is supportable by the evidence. Because the Bankruptcy Court could have chosen the "extremes" offered by the parties, this Court is hard-pressed to conclude that the Bankruptcy Court's finding of a 68.5% growth rate is clearly erroneous. Accordingly, Thomasville's Sixth Assignment of Error is Overruled.

F. *Bankruptcy Court's Calculation of the Bankruptcy Effect*

■ As its Seventh Assignment of Error, Thomasville argues that the Bankruptcy Court's calculation of the bankruptcy effect was understated and, therefore, is clearly erroneous. *First*, Thomasville cites as error the Bankruptcy Court's calculation of the bankruptcy effect by using all Elder–Beerman sales rather than its sales of Thomasville furniture or its overall furniture sales. *Second*, Thomasville states that the Bankruptcy Court erred in correcting the deficiencies it noted in the calculation of the bankruptcy effect by

Elder–Beerman's expert. The Bankruptcy Court's determination of the effect of the bankruptcy on Elder–Beerman sales during the Damages Period is a factual finding, which this Court reviews for clear error.

■ The crux of Thomasville's argument is that there was substantial evidence that sales of special order products, such as Thomasville furniture, suffer a larger bankruptcy effect than "cash and carry" items. According to Thomasville's expert, Steven Pierce, this increased bankruptcy effect is attributable to the fact that consumers are wary of placing deposits on special order items, fearing that the deposit may be lost or placed at risk as a result of the bankruptcy filing. In support of its argument, Thomasville also presented the testimony of Mr. Nesbit, who related statements from Elder–Beerman salespersons that some consumers expressed unwillingness to make a special order purchase that required a downpayment. Thomasville further offered into evidence a newspaper article from the *Cincinnati Enquirer*, warning consumers about placing deposits with struggling furniture retailers. Thomasville, therefore, argues that the Bankruptcy Court erred in ignoring this evidence and in calculating the bankruptcy effect using sales of all Elder–Beerman products.

Contrary to Mr. Pierce's opinion that sales of special order items would suffer a greater short-term impact from the filing of a Bankruptcy Petition, Elder–Beerman's expert, Julian Taub, testified that he had "looked for the effect of bankruptcy on the Bloomingdale's furniture business, particularly identifying the furniture business, to look for an effect [but he] didn't find any. [He] didn't find any drop in sales that could be explained because of a bankruptcy. There was no change in the trend of the business." (1 Testimony of Taub 207–8) Mr. Taub again testified that the short-term dip in Elder–Beerman's total business was consistent with his experience with Bloomingdale's, but as to the

drop in Thomasville furniture sales, he had "never seen anything like it." (*Id.* at 176) Mr. Taub, thereby, provided evidence that the filing of a Bankruptcy Petition would not necessarily affect a department store's furniture sales differently than its cash and carry sales. Although the Bankruptcy Court did not specifically address Thomasville's arguments for using only furniture sales to calculate the bankruptcy effect, it had competent evidence from which it could conclude that calculating the bankruptcy effect using Elder–Beerman's total sales, rather than looking at furniture sales alone, was reasonable. Accordingly, the Bankruptcy Court's use of total Elder–Beerman sales was not clearly erroneous.

As for Thomasville's assertion that the Bankruptcy Court erred in correcting the deficiencies it noted in the calculation of the bankruptcy effect by Elder–Beerman's expert, Thomasville again disputes, in essence, that the Bankruptcy Court had the ability to calculate on its own any component of the award to Elder–Beerman. As discussed, *supra,* the Bankruptcy Court had the ability and responsibility to evaluate the credibility of the witnesses and the other evidence presented. *Barnett,* 153 F.3d 338. Furthermore, it was in the position to evaluate and determine what facts, including the extent of the bankruptcy effect, were reasonably certain. *See Miami Packaging, Inc.,* 792 F.Supp. at 566.

In calculating the amount of the bankruptcy effect, Mr. Taub provided evidence of, and used, the average monthly change in total Elder–Beerman sales. In reviewing Mr. Taub's calculation, the Bankruptcy Court took issue with his use of the average monthly change of total Elder–Beerman sales for the month of January, 1996, in light of the fact that Mr. Taub had testified that the bankruptcy effect had ceased during that month. (1 Testimony of Taub at 172, 176) Accordingly, the Bankruptcy Court could, and did, based on the evidence before it, reasonably recalculate the bankruptcy effect using data from only November, 1995, and December, 1995,

the months in which the bankruptcy effect was still a factor. Neither the Bankruptcy Court's use of Elder–Beerman's total sales, rather than looking at furniture sales alone, nor its recalculation of the bankruptcy effect is clearly erroneous.

### G. *Lost Profits from the Sale of Non– Thomasville Furniture*

Thomasville's Eighth Assignment of Error contends that the Bankruptcy Court erred in awarding lost profits from the sale of non-Thomasville furniture. Thomasville focuses on two aspects of the evidence. *First,* it argues that the testimony of Elder–Beerman's expert, Mr. Taub, indicates that Elder–Beerman did not have a decrease in sales of non-Thomasville furniture during the Damages Period. Elder–Beerman, accordingly, did not lose profits of non-Thomasville furniture. *Second,* Thomasville argues that Elder–Beerman's statistic that customers who purchased $100 of Thomasville furniture also purchased $30.90 in non-Thomasville furniture is insufficient to prove that the lost Thomasville furniture sales caused a loss in non-Thomasville furniture sales. Both of Thomasville's arguments have merit.

Elder–Beerman's proof of lost profits from lost sales of non-Thomasville furniture consisted of a correlation between the sale of Thomasville furniture and the sale of the non-Thomasville variety. Mr. Taub analyzed the records for Elder–Beerman charge accounts for a four month period prior to the filing of the Bankruptcy Petition. (1 Testimony of Taub 173) According to those records, Elder–Beerman customers purchased, during that four month period, $30.90 of non-Thomasville furniture for every $100 of Thomasville furniture. However, Elder–Beerman did not provide any evidence to indicate that the purchase of the non-Thomasville furniture occurred at the same time as the Thomasville furniture or was related in any way to the purchase of that Thomasville furniture. Although the testimony establishes a correlation be-

tween sales of the two items, that ratio, by itself, does not evidence a causal relationship between the sales of one of these two distinct classes of furniture upon the sales of the other.

On the contrary, on cross-examination, Mr. Taub also testified that he did not notice a quarter to quarter percentage change in non-Thomasville furniture sales similar to that of Thomasville furniture sales.

> [Poovey:] ... My question was whether you have done a comparative analysis of other furniture lines besides Thomasville for the same quarters that you have done here, comparing quarter-to-quarter?
>
> [Taub:] ... Yes; I looked at the sales of non-Thomasville furniture, percent change quarter-to-quarter, and had them plot it on the graph and saw very little change in the non-Thomasville furniture business compared to what happened to Thomasville. Leading me to believe there's no sociological, demographic or catastrophic factor in the Dayton trading area that would cause the sales to go down other than something happened in Thomasville.

(1 Testimony of Taub 199) [19] By stating that little change occurred in sales of non-Thomasville furniture, while Thomasville furniture sales dropped dramatically, this aspect of Mr. Taub's testimony destroys and renders clearly erroneous a causal relationship between the sale of these items. In fact, Mr. Taub's statement contradicts Elder–Beerman's assertion that losses of sales of non-Thomasville furniture were suffered as a result of Thomasville's actions. Therefore, although Elder–Beerman presented a correlation between the sale of Thomasville furniture and the non-Thomasville counterparts, there was no testimony indicating that the sales of non-Thomasville furniture were, in fact, impacted by the decline in the sales of Thomasville furniture. Accordingly, Elder–

Beerman has not established that it has sustained losses in non-Thomasville furniture sales due to Thomasville's actions or that those losses were caused by the Assumed Breaches. To the extent that the Bankruptcy Court found, based on the correlation, that the Assumed Breaches caused lost profits of non-Thomasville furniture, that finding is clearly erroneous. On remand, the Bankruptcy Court must recalculate the amount of lost profits suffered by Elder–Beerman, excluding losses in non-Thomasville furniture sales.

### H. Credit Card Carrying Charges

Next, Thomasville contends that the Bankruptcy Court misapplied Ohio law with respect to the interpretation of the Agreed Order between the parties. Specifically, Thomasville asserts that the court incorrectly determined that the term "credit card carrying charges" was ambiguous and, therefore, that it wrongfully considered the intent of the parties in drafting the agreement, using that term. Thomasville further argues that the Bankruptcy Court incorrectly applied rules of construction, resulting in the court interpreting the Agreed Order to Elder–Beerman's benefit.

■ An appellate court reviews de novo the district court's interpretation of an agreed order. Covington v. Covington Landing Ltd. Part., 71 F.3d 1221, 1227 (6th Cir.1995); see Harrison v. Metropolitan Gov't of Nashville, 80 F.3d 1107, 1113 (6th Cir.), cert. denied, 519 U.S. 863, 117 S.Ct. 169, 136 L.Ed.2d 111 (1996); Huguley v. General Motors Corp., 67 F.3d 129, 132 (6th Cir.1995). The Sixth Circuit has stated that "great deference" should be given to the interpretation of an order by the court which entered that order. See, e.g., Kendrick v. Bland, 931 F.2d 421, 423 (6th Cir.1991)(consent decree). However, it has clarified that instruction, stating that the district court's reading of the decree was merely an additional tool for arriving at its interpretation. Huguley v. General

---

**19.** Elder–Beerman did not rehabilitate Mr. Taub with respect to this testimony.

Motors Corp., 52 F.3d 1364, 1370 (6th Cir. 1995), citing Brown v. Neeb, 644 F.2d 551, 558, n. 12 (6th Cir.1981).

"An agreed order, like a consent decree, is in the nature of a contract, and the interpretation of its terms presents a question of contract interpretation." Covington, 71 F.3d at 1227. The basic principles of contract interpretation are well-established:

> Generally, courts presume that the intent of the parties to a contract resides in the language they chose to employ in the agreement... Only when the language of a contract is unclear or ambiguous, or when the circumstances surrounding the agreement invest the language of the contract with a special meaning will extrinsic evidence be considered in an effort to give effect to the parties' intentions... When the terms in a contract are unambiguous, courts will not[,] in effect[,] create a new contract by finding an intent not expressed in the clear language employed by the parties.

Shifrin v. Forest City Enters., Inc., 64 Ohio St.3d 635, 638, 597 N.E.2d 499, 501 (1992) (citations omitted); see also Firefighters Local Union No. 1784 v. Stotts, 467 U.S. 561, 574, 104 S.Ct. 2576, 81 L.Ed.2d 483 (1984)(consent decrees generally " 'must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it' or by what 'might have been written had the plaintiff established his factual claims and legal theories in litigation' ")(quoting United States v. Armour and Co., 402 U.S. 673, 681–82, 91 S.Ct. 1752, 29 L.Ed.2d 256 (1971); Lorain NAACP v. Lorain Bd. of Educ., 979 F.2d 1141, 1148 (6th Cir.1992)), cert. denied, 509 U.S. 905, 113 S.Ct. 2998, 125 L.Ed.2d 691 (1993). Thus, if a contract is clear and unambiguous, its interpretation is a matter of law and no issues of fact exist. Alexander v. Buckeye Pipe Line Co., 53 Ohio St.2d 241, 246, 374 N.E.2d 146, 150 (1978). Courts must give the contract reasonable construction in conformity with the parties' intent, as expressed by the words of the contract. Dealers Dairy Products Co. v. Royal Ins. Co., 170 Ohio St. 336, 164 N.E.2d 745 (1960).

A contract is ambiguous if it is susceptible to more than one reasonable interpretation. American Druggists' Ins. Co. v. Equifax, Inc., 505 F.Supp. 66 (S.D.Ohio.1980)(Hogan, J.); City of Hillsboro v. Fraternal Order of Police, Ohio Labor Council, Inc., 52 Ohio St.3d 174, 177, 556 N.E.2d 1186 (1990). "In making the determination of whether language is ambiguous, courts must generally give words and phrases their plain, ordinary, natural or commonly accepted meaning." Gomolka v. State Auto. Mut. Ins. Co., 70 Ohio St.2d 166, 167–168, 436 N.E.2d 1347 (1982).

Paragraph 3 of the Agreed Order states, in pertinent part:

> Elder–Beerman's claims for damages against Thomasville (the "Damage Claims") shall be limited to[:] . . . (ii) damages, if any, for the time period from October 17, 1995, to July 31, 1996, caused by the Assumed Breaches. Elder–Beerman's Damage Claims shall be limited to lost profits from the losses of Thomasville furniture sales, non-Thomasville furniture sales, ancillary sales, and credit card carrying charges.

At the October, 1996, hearing, Elder–Beerman presented evidence of lost revenues from installment credit and credit card sales. Thomasville objected to the evidence regarding installment credit sales, stating that Elder–Beerman had restricted itself, in the Agreed Order, to credit card charges only. In support of its presentation of installment credit carrying charges, Elder–Beerman argued that both types of credit sales are treated under one "credit umbrella" and, thus, Elder–Beerman considers "credit card carrying charges" to include carrying charges from both types of credit sales.

On its face, "credit card carrying charges" is not an ambiguous term. It appears to apply only to those carrying charges resulting from credit transactions which are consummated by the presentation of a credit card to the cashier. Other credit transactions, such as those in which the consumer signs an agreement to pay the amount due over installments, are not obviously included in "credit card" transactions. However, when applying the definition of "credit card carrying charges" to Elder–Beerman's sales practices, as expressed by Mr. Broderick, Elder–Beerman's Vice President of Credit, multiple reasonable interpretations are available, suggesting a latent ambiguity in the phrase.

"A latent ambiguity is a defect which does not appear on the face of language used or an instrument being considered. It arises when language is clear and intelligible and suggests but a single meaning, but some intrinsic fact or some extraneous evidence creates a necessity for interpretation or a choice between two or more possible meanings, as where the words apply equally well to two or more different subjects or things." *Conkle v. Conkle,* 31 Ohio App.2d 44, 51, 285 N.E.2d 883, 887–888 (Coshocton Cty.1972); *American Druggists' Ins. Co.,* 505 F.Supp. 66. Once an ambiguity in a contract is established, extrinsic evidence is admissible to determine the intent of the parties. *Dorsey v. Contemporary OB–GYN, Inc.,* 113 Ohio App.3d 75, 84, 680 N.E.2d 240, 245 (Mont.Cty.1996); *Illinois Controls, Inc. v. Langham,* 70 Ohio St.3d 512, 639 N.E.2d 771, paragraph two of the syllabus (1994). If the court concludes that a situation involved in the dispute was omitted from the agreement, "the court must engage in a process of *inference* to resolve the omission according to the actual expectations of the parties or general principles of fairness and justice." *Dorsey,* 680 N.E.2d at 247 (emphasis in original), *citing* Farnsworth, *Omissions in Contracts,* 68 Colum. Law Rev. 860 (1968). "Since latent ambiguity is disclosed by extrinsic evidence, it may be removed by such evidence." *Conkle,* 285 N.E.2d at 887. The court's resolution of the ambiguity is a factual determination, which this Court reviews for clear error. *See Potti v. Duramed Pharmaceuticals, Inc.,* 938 F.2d 641, 647 (6th Cir.1991).

Because reference to other language in the Agreed Order does not provide any assistance in interpreting the phrase "credit card carrying charges", the Bankruptcy Court appropriately turned to extrinsic evidence, namely the testimony of Timothy Broderick, to determine which credit transactions were included within the phrase. The Bankruptcy Court found that this phrase meant all point-of-sale transactions processed through the Elder–Beerman credit card system. This interpretation is not clearly erroneous.

The testimony before the Bankruptcy Court focused on the relationship between sales purchased on the Elder–Beerman charge card and those made by installment sales. Mr. Broderick testified that a credit card is used to initiate both a credit card sale and an installment sale:

> [Organ:] Now explain to the court how a customer that wishes to buy furniture on credit would go about doing that at an Elder Beerman store?
>
> [Broderick:] The normal case of business the customer would present himself in the store, show the Elder Beerman credit card. In turn we would do a credit look up on the card, if they would qualify we would grant the credit for furniture.
>
> [Organ:] How is that different from someone who does installment sales purchase.
>
> [Broderick:] There would be no difference.
>
> [Organ:] Meaning they'd still present their credit card?
>
> [Broderick:] That would be correct.

(2 Testimony of Broderick 182) The Bankruptcy Court also directly questioned Mr.

Broderick as to the use of the credit card when making installment purchases:

> [Broderick]: The customer number on the installment contract would be the same customer number that you would have on your credit card sir.
>
> [Court:] Would you use that credit card in order to initiate the installment sale also, is that what I'm hearing you say?
>
> [Broderick:] Yes sir you would.

(2 Testimony of Broderick 188) Furthermore, Mr. Broderick stated that both types of credit sales were billed together in the same envelope under the credit card number assigned to the customer. Although Mr. Broderick testified that an installment sale required the customer to sign an installment sale contract rather than a charge card receipt (1 Testimony of Broderick 257), the Bankruptcy Court had sufficient basis to conclude both types of credit transactions were tied to the Elder–Beerman credit card. Therefore, that court's determination that installment sales transactions are within the meaning of "credit card" transactions is supported by the evidence. Accordingly, the interpretation of the Agreed Order as to the phrase "credit card carrying charges" to include carrying charges from both charge card sales and installment sales was not clearly erroneous.

I. *Requirement that Lost Profit Damages be in the Contemplation of the Parties*

Thomasville questions the propriety of the Bankruptcy Court's conclusion that Elder–Beerman carried its burden of proving that profits from non-Thomasville furniture and profits from credit card carrying charges were within the contemplation of the parties at the time they made their contract. Paragraph 2 of the Agreed Order states: "To recover the Damage Claims (defined in ¶ 3 below) from Thomasville, Elder–Beerman must prove causation and damages." (R. at 62) In its opinion, the Bankruptcy Court stated, in pertinent part:

> Elder–Beerman need not, therefore, establish every element of a state contract law damages claim in order to recover. Elder–Beerman need only establish causation and damages as per the Agreed Order dated September 26, 1996. [citation omitted].
>
> With this in mind, the court will examine in turn each of Elder–Beerman's claims for lost profits (lost Thomasville sales, lost ancillary sales, and lost credit income) for causation and damages.

206 B.R. at 154. By this statement, the Bankruptcy Court implicitly interpreted the Assumed Order to provide unambiguously that the parties agreed that Elder–Beerman need not prove all three prongs of Ohio's test for the recovery of lost profits, as set forth in *Combs.*

Upon review of the Agreed Order, this Court agrees that the provision is unambiguous. Although Ohio law requires that a plaintiff seeking lost profits prove that such profits were in the contemplation of the parties at the time of the execution of the contract, Elder–Beerman and Thomasville clearly stipulated in their Agreed Order that Elder–Beerman need only prove causation and damages, the second and third prongs of the *Combs* test. The Agreed Order does not contain other provisions which would create an ambiguity. Thus, as stated in footnote 7, *supra,* this Court concludes that the Agreed Order unambiguously provides that Elder–Beerman need not prove that lost profit damages were in the contemplation of the parties. Although the Bankruptcy Court considered whether the profits from Thomasville furniture were within the contemplation of the parties, it did need not have done so under the Agreed Order. By the express provision in the Agreed Order, Thomasville has waived its right to contest the Bankruptcy Court's failure to do so with regard to non-Thomasville furniture sales and credit card carrying charges. Thomasville's assignment of error is overruled.

**J.** *Attorney's Fees*

The amount, if any, of attorney fees due to Elder–Beerman was based on a formula stipulated to by the parties in the Agreed Order. Because this Court concludes that this case must be remanded to the Bankruptcy Court for further findings of fact and recalculation of damages, the Bankruptcy Court's determination of the amount of attorney's fees must similarly be recomputed.

WHEREFORE, based upon the aforesaid, this case must be remanded to the Bankruptcy Court for determinations as to whether the winter weather was an intervening cause of the drop in sales of Thomasville products during the first quarter of 1996, whether Elder–Beerman saved commission expenses for the projected sales above the amount sold in the previous year, whether the Assumed Breaches caused lost profits of non-Thomasville furniture and, therefore, for a recalculation of the amount of lost profits suffered by Elder–Beerman due to Thomasville's actions and the amount of attorney's fees to be awarded to Elder–Beerman, consistent with this opinion. To the extent of the matters remanded, the decision and judgment of the Bankruptcy Court are reversed. As to all other assignments of error presented by Thomasville, the Bankruptcy Court's opinion is affirmed. Accordingly, the Decision and Judgment of the United States Bankruptcy Court for the Southern District of Ohio, awarding lost profit damages and attorney's fees as compensatory civil contempt damages for violation of the automatic stay, is hereby Affirmed in Part, Reversed In Part, and Remanded to the Bankruptcy Court. Judgment will be entered accordingly.

The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.